141 N.J. Super. 365 (1976)
358 A.2d 473
VINCENT NEVEROSKI AND JOANNE NEVEROSKI, HIS WIFE, PLAINTIFFS-RESPONDENTS AND CROSS-APPELLANTS,
v.
ALFRED BLAIR AND MARION BLAIR, HIS WIFE, DEFENDANTS-RESPONDENTS AND CROSS-APPELLANTS, AND W.T. GRANT CO., A CORPORATION AUTHORIZED TO DO BUSINESS IN THE STATE OF NEW JERSEY, AND BLUE RIBBON REALTY, A CORPORATION AUTHORIZED TO DO BUSINESS AS A LICENSED REAL ESTATE BROKER IN THE STATE OF NEW JERSEY, DEFENDANTS-APPELLANTS AND CROSS-RESPONDENTS, AND LARSON MORTGAGE COMPANY, DEFENDANT AND THIRD-PARTY PLAINTIFF,
v.
THE PORTER COMPANY, LTD., A CORPORATION AUTHORIZED TO DO BUSINESS IN THE STATE OF NEW JERSEY, THIRD-PARTY DEFENDANT.
Superior Court of New Jersey, Appellate Division.
Argued October 21, 1975.
Resubmitted January 27, 1976.
Decided March 3, 1976.
*369 Before Judges LYNCH, LARNER and HORN.
Mr. Thomas L. Bace argued the cause for plaintiffs-respondents (Messrs. Hiering, Grasso, Gelzer & Kelaher, attorneys).
Mr. David P. Loughran argued the cause for defendant-appellant W.T. Grant Co. (Messrs. Sutton, Ward, Sutton, Heim & O'Malley, attorneys).
Mr. Donald T. Joworisak argued the cause for defendant-appellant Blue Ribbon Realty (Mr. Thomas W. Sharlow, attorney).
Mr. Steven P. Russo argued the cause for defendants-respondents.
PER CURIAM:
On December 1, 1972 plaintiffs Vincent and Joanne Neveroski purchased a home in Bayville, New Jersey, from Alfred and Marion Blair. Some four months after they took possession the Neveroskis found that the house was so infested with termites that they were compelled to vacate the premises. Therein lies the genesis of this litigation.
The Neveroskis alleged in their complaint that although it was represented to them that the premises were free of termites it was known that the situation was to the contrary and that the house had suffered extensive termite damage. The Neveroskis named as defendants the sellers (Blairs), the *370 service company that had treated the premises for termites and had certified before the closing that they were free thereof (W.T. Grant), the real estate broker which handled the sale of the property (Blue Ribbon), and the mortgage company that issued the mortgage on the house (Larson Mortgage Co.). Larson impleaded the Porter Company, Ltd., appraisers, upon which it had relied in issuing the mortgage. The Neveroskis charged that defendants deceived them as to the condition of the premises and sought rescission of their purchase, cancellation of their mortgage, damages and other relief on the grounds of fraud, negligence, breach of warranty and breach of contract. Ultimately their claim for relief was reduced to damages. Plaintiffs also sought treble damages from defendants pursuant to the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 et seq. (act). The Blairs cross-claimed against W.T. Grant for failing to properly exterminate the termites and for treble damages under the act. Numerous cross-claims for contribution and indemnification were also filed.
At the conclusion of the testimony the trial judge dismissed defendants Larson and Porter from the case. Thereafter the judge, sitting without a jury, rendered an oral opinion pursuant to which a judgment was entered in favor of the Neveroskis as follows:
(1) against the Blairs and Blue Ribbon in the amount of $5,000 jointly and severally for fraudulent concealment of the termite condition, and an alternative judgment against the Blairs in the same amount on a theory of breach of contract;
(2) against W.T. Grant and Blue Ribbon Realty jointly and severally for $15,000 plus attorneys' fees of $2,000 and costs of suit on the ground that defendants engaged in deceptive practices contrary to the Consumer Fraud Act. The trial judge denied contribution between defendants on this count.
The Blairs were awarded damages on their cross-claims against W.T. Grant as follows:
(1) pursuant to their claim under the Consumer Fraud Act, the sum of $3,270 (representing three times the total service charge under *371 the termite service contract between the Blairs and W.T. Grant) plus attorneys' fees of $1,500 and costs of suit;
(2) pursuant to their negligence claim, any amount up to $5,000 to the extent that the Blairs actually pay any or all of the $5,000 for which they had been held liable to the Neveroskis.
The following chronology of events will help to elucidate the somewhat confused state of the record:

November 1971 The Blairs noticed termites in their
 living room.
November 6, 1971 The Blairs signed a contract with W.T.
 Grant for termite treatment priced at
 $1,090, which came to a total cost of
 $1,485.76, including installment contract
 interest. In the same month two men
 representing W.T. Grant treated the
 home.
March 1972 The Blairs experienced another episode
 of termites and called W.T. Grant. A
 few weeks later a representative came
 and again treated the premises.
June 1972 The Blairs signed a contract to sell
 their property to the Neveroskis for
 $21,900. The contract was drawn by
 Larry Williams of Blue Ribbon Realty
 and contained the following clause:
 It is agreed that at the sellers expense
 the premises shall be subject to a termite
 inspection and report by a reputable company
 and in the event of a positive report
 the seller shall bear the cost of all
 remedial action that may be necessary and
 further a copy of the report whether it be
 negative or positive shall be submitted to
 the buyer.
July 1972 John Hooyman, president of Blue Ribbon,
 who did not know of the W.T.
 Grant termite service contract, asked

*372
 the Eastern Exterminating Company
 to inspect the property. We accept the
 testimony of Robert Howe, the owner
 of Eastern, that after the property was
 inspected he called Blue Ribbon and
 told them that Eastern had found extensive
 termite damage at the Blairs'
 home and would not certify it because
 another company had done work there.
 Hooyman admitted that Blue Ribbon
 never informed the Neveroskis about
 Eastern's findings.
 Alfred Blair also called Larry Williams
 and told him the results of Eastern's
 inspection. After Williams told Hooyman
 about the W.T. Grant contract,
 Hooyman called that company and asked
 them to inspect and certify the property.
July 11, 1972 The W.T. Grant representative,
 Kenneth Foley, sent a letter addressed
 "To Whom It May Concern," which
 read:
 Based on a careful visual inspection of
 all accessible areas and on sounding of all
 accessible structural members, there is no
 evidence of termite infestation or other
 wood destroying insects infesting the subject
 property at the present time.
 If such infestation previously existed, it
 has been corrected.
 At trial Foley admitted that in fact
 no inspection of the Blairs' house was
 conducted at the time the letter was
 sent. He stated he relied on the fact
 that the house had been treated in
 March and that the person who called

*373
 him about reinspection told him there
 had been no problems since that time.
December 1, 1972 The closing between the Blairs and the
 Neveroskis took place. The Neveroskis
 were represented by an attorney procured
 for them by Blue Ribbon. The
 Neveroskis had visited the house several
 times but had not noticed termite damage.
 At the closing no mention was
 made to them of any such problem.
 However, they were aware of the termite
 service contract with W.T. Grant.
March 1973 The Neveroskis experienced some problem
 with insects after they moved in.
 In March, termites twice swarmed
 throughout the house. The Neveroskis
 contacted W.T. Grant but could not
 obtain immediate service. When they
 felt they could no longer wait, they
 hired Terminex, Inc. to treat the premises
 for $260.
 At trial, the testimony as to the extent
 of damage to the house was conflicting.
 Plaintiff produced two contractors
 whose estimates of the cost of necessary
 repairs ranged from $10,500 to $13,000.
 Blue Ribbon's expert estimated damages
 at $500 to $1,000. The trial judge
 fixed the cost of repairs at $5,000.

Blue Ribbon's common law liability[1]
Blue Ribbon contends that the trial judge's conclusion holding it liable to the Neveroskis for failing to disclose latent termite infestation was not supported by sufficient *374 credible evidence and was contrary to the holding of Weintraub v. Krobatsch, 64 N.J. 445 (1974).
Weintraub held that a seller of property is liable if he fails to disclose to the buyer an infestation of insects that is of sufficient magnitude to be deemed material. In the course of its opinion the Supreme Court discussed the California case of Saporta v. Barbagelata, 220 Cal. App.2d 463, 33 Cal. Rptr. 661 (D. Ct. App. 1963), where the plaintiffs sought to rescind their purchase of a house on the ground that they were defrauded by the seller's real estate broker who concealed the fact that the house contained an extensive termite and fungus infestation. A summary judgment against plaintiffs was reversed by the Court of Appeals. The New Jersey Supreme Court quoted the following passage from that opinion which it considered of "particular pertinence":
The principles controlling the conduct of a real estate agent or broker in the sale of real estate are well established in this state. He is not only liable to a buyer for his affirmative and intentional misrepresentations to a buyer, but he is also liable for mere nondisclosure to the buyer of defects known to him and unknown and unobservable by the buyer. [Citations omitted]. The underlying settled rule is that every person connected with a fraud is liable for the full amount of the damages and the wrongdoers, if any, are jointly and severally liable. [citations omitted]. Whether a matter not disclosed by a real estate broker or agent is of sufficient materiality to affect the desirability or value of the property sold, and thus make him liable for fraudulent nondisclosure, depends upon the facts of each case. [Citation omitted]. In the case at bench we have allegations which present triable issues of fact tendered not only on the basis of positive misstatements and misrepresentations of fact allegedly made by Dolman, but also the alleged suppression and nondisclosure of facts known to him and unknown and unobservable by plaintiffs. [64 N.J. at 454-455, quoting Saporta, supra, 33 Cal. Rptr. at 667]
In the present case the Blairs left to Blue Ribbon the termite inspection required by the contract of sale. Mr. Hooyman of Blue Ribbon asked Eastern Exterminating to inspect the property. Mr. Howe of Eastern Exterminating advised Blue Ribbon that Eastern had found extensive *375 termite damage at the house and would not certify it because W.T. Grant had done work there. Mr. Blair testified that he informed Mr. Williams of Blue Ribbon of the results of Eastern's inspection. Hooyman admitted that Blue Ribbon never informed the Neveroskis about Eastern's findings. Despite his knowledge of the termite problem, Hooyman solicited a certification from W.T. Grant. When he received the latter's letter certifying the absence of termites, he forwarded it to the Larson Mortgage Co. Presumably it was among the papers at the closing which was attended by the attorney selected by Blue Ribbon. Mrs. Neveroski testified that when she started to review the papers at the closing the attorney told her there was no time to do that and that everything was in order.
We consider it incontrovertible that the termite condition here was of sufficient materiality to affect the desirability and value of the property and that if the Neveroskis had known of the extent of the damage they would not have consummated the purchase. Since Blue Ribbon deliberately concealed from the Neveroskis the material fact of the termite condition, and since the Neveroskis reasonably relied on the broker's actions, it is entirely appropriate to hold Blue Ribbon liable to the purchasers.
Blue Ribbon[2] contends that the award of $5,000 in damages for the termite condition was excessive. Plaintiffs Neveroski argue that the award was inadequate. We conclude that there was ample credible evidence in the record to support the award in that amount. The judgment in that respect is therefore affirmed.

Liability of Blue Ribbon under New Jersey Consumer Fraud Act
The trial judge held Blue Ribbon liable to Neveroski for treble damages and counsel fees under the New Jersey Consumer *376 Fraud Act, N.J.S.A. 56:8-1 et seq. Blue Ribbon contends on appeal that this determination is erroneous in that the Consumer Fraud Act does not apply to the sale of real estate or the services rendered by a broker in connection with such a sale.
Our review of the record satisfies us that if the act encompasses within its ambit deceptive, unconscionable or fraudulent acts in connection with the sale of real estate, there is sufficient credible evidence to sustain the finding of a violation thereof by Blue Ribbon. Thus there is placed in sharp focus the novel question whether the Consumer Fraud Act, in the form it existed at the time of the operative facts involved in this litigation, is applicable to real estate transactions.
It has been suggested that the remedy of treble damages under the act is not available to plaintiffs because of lack of privity between them and Blue Ribbon. We do not consider that privity is a condition precedent to recovery under this act. Section 19 clearly grants a remedy to "any person who suffers any ascertainable loss * * * as a result of the use" of any practice declared unlawful. There is no provision that the claimant thereunder must have a direct contractual relationship with the seller of the product or service.
The Neveroskis, as the purchasers, sustained losses as a result of the concealment by Blue Ribbon of the presence of termite damage "in connection with" the sale of the real estate. They were therefore persons "in interest" entitled to the treble damages mandated by the statute (N.J.S.A. 56:8-19), provided that Blue Ribbon and its brokerage services are within the ambit of the Act. See S.E.C. v. Texas Gulf Sulphur Co., 401 F.2d 833, 858 (2 Cir.1968), cert. den. 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969), for an analogous holding which grants a right of action for losses arising from deceptive practices under the Securities and Exchange Act despite the absence of privity.
*377 When the Consumer Fraud Act was first adopted in 1960 "merchandise" was defined in § 1 as "any objects, wares, goods, commodities or services." L. 1960, c. 39, § 1(c). In 1967 a bill was introduced expanding the definition of "merchandise" to include "any objects, wares, goods, commodities, real estate, securities, services or anything offered directly or indirectly to the public for sale." Assembly Bill 715, introduced March 13, 1967. Prior to passage of this bill however it was amended by deleting the words "real estate, securities" and was finally adopted in that deleted form. The legislation has remained unchanged in any relevant respect through the period involved in this litigation until the adoption of a recent amendment on January 19, 1976.[3]
In addition to criminal penalties and remedies available to the Attorney General for violations, the act also provides for a civil action for treble damages by "any person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful *378 under this act." N.J.S.A. 56:8-19. Section 2 of the act defines an "unlawful practice" as follows:
The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice; * * *. [N.J.S.A. 56:8-2]
The problem of interpretation, therefore, must revert to the definition of "merchandise" in § 1. As already noted, the Legislature in 1967 deleted "real estate" and "securities" from the expanded language. We would consider such a deletion as a meaningful act on the part of the Legislature eliminating these two areas of commercial activity from the purview of the statute.
We recognize a possible alternative construction to the effect that the deletion was made because of an assumption that the express words were unnecessary in view of the catch-all phrase "or anything offered, directly or indirectly, to the public for sale."
Nevertheless, it is our considered opinion that the entire thrust of the Consumer Fraud Act is pointed to products and services sold to consumers in the popular sense. Such consumers purchase products from retail sellers of merchandise consisting of peronal property of all kinds or contract for services of various types brought to their attention by advertising or other sales techniques. The legislative language throughout the statute and the evils sought to be eliminated point to an intent to protect the consumer in the context of the ordinary meaning of that term in the market place.[4]
*379 Turning to the statutory clause under consideration, all the words utilized in the definition of "merchandise" are consonant with this interpretation.
The additional general language can be construed under the doctrine of ejusdem generis as a comprehensive definition intended to incorporate other products or services similar in nature to those enumerated by the specific words. Denbo v. Moorestown Tp., 23 N.J. 476 (1957); Bergen Cty. Bd. of Tax. v. Bogota, 104 N.J. Super. 499 (Law Div. 1969); 2A Sutherland, Statutory Construction (4 ed 1973), § 47.17. Real estate is wholly foreign to any of the listed examples specifically referred to in the definition. The inclusion of the general language can logically be attributed to a legislative desire to incorporate other consumer transactions which may not strictly come within the specifically defined categories.
A real estate broker is in a far different category from the purveyors of products or services or other activities. He is in a semi-professional status subject to testing, licensing, regulations and penalties through other legislative provisions. See N.J.S.A. 45:15-1 et seq. Although not on the same plane as other professionals such as lawyers, physicians, dentists, accountants or engineers, the nature of his activity is recognized as something beyond the ordinary commercial seller of goods or services  an activity beyond the pale of the act under consideration.
Certainly no one would argue that a member of any of the learned professions is subject to the provisions of the Consumer Fraud Act despite the fact that he renders "services" to the public. And although the literal language may be construed to include professional services, it would be ludicrous to construe the legislation with that broad a sweep in view of the fact that the nature of the services does not fall into the category of consumerism.
*380 Similarly, in the absence of clear and explict language in the statute, a broker who negotiates the sale of real estate and thereby renders "services" is nevertheless outside the scope of persons sought to be covered by the Act.
The judgment against Blue Ribbon for treble damages and counsel fees for violation of the Consumer Fraud Act is reversed.

Liability of Blairs under the New Jersey Consumer Fraud Act
The trial judge denied recovery against the Blairs as the seller of the property for treble damages under the Consumer Fraud Act. We agree that the act does not apply to the seller of real estate for some of the reasons expressed in the discussion of the statutory liability of Blue Ribbon. Real estate, as such, is not included in the definition of the products encompassed by the act, nor is it a commodity which can be considered included within the more general statutory language. In the absence of a clear expression of intent to include the normal sale of real estate by a home-owner within the compass of the statute, we find that the act, as articulated, does not cover such a sale. The judgment in favor of the Blairs on this score is affirmed.
In this connection we are mindful of the case of Olive v. Graceland Sales Corp., 61 N.J. 182 (1972), wherein the court sustained a class action for violation of the Consumer Fraud Act in connection with sales of grave sites. The issue of the applicability of the act to real estate sales was not raised or considered by the court. The court explicitly noted that it was not passing upon the legal sufficiency of the action. 61 N.J. at 189. It only considered the procedural question of whether a class action was appropriate.
In view of the limited nature of the holding and the significant distinction between the sale of burial plots to the public and the individual sale of a parcel of real estate, we do not consider Graceland Sales as authority for a contrary result.

*381 W.T. Grant's liability to the Neveroskis under the New Jersey Consumer Fraud Act

As we have noted, the trial judge held W.T. Grant jointly and severally liable with Blue Ribbon under the Consumer Fraud Act for treble damages in the amount of $15,000 plus attorneys' fees of $2,000 and costs of suit. W.T. Grant contends this holding was erroneous.
It will be recalled that on July 11, 1972, W.T. Grant certified that based upon a careful visual inspection of the premises there was no evidence of termite infestation at that time and that if such infestation previously existed it had been corrected. In fact, there was no visual inspection on or about that day.
Clearly, the issuance of such a false and misleading document is the type of practice that the Consumer Fraud Act meant to punish. Since W.T. Grant knew from Mr. Hooyman of Blue Ribbon that its letter would be used to certify to the purchaser that the house was not infested, and since it addressed the letter "To Whom It May Concern," we conclude that W.T. Grant knew and intended that the Neveroskis and others would rely on the contents of the letter. Since this certificate was issued in connection with the termite service contract between W.T. Grant and the Blairs, and since such services are "merchandise" within the meaning of the Consumer Fraud Act, the trial court correctly held that the Neveroskis can recover for their loss. N.J.S.A. 56:8-2; N.J.S.A. 56:8-19.

Damages
The next question involves the amount of damages recoverable by the Neveroskis. The $15,000 judgment entered by the trial judge represented three times the damages assessed for the cost of repairs. This award in favor of the Neveroskis and against W.T. Grant was in addition to the *382 $5,000 judgment against the Blairs and Blue Ribbon for common law fraud.
We conclude that to permit the Neveroskis to recover satisfaction on both the $15,000 and the $5,000 awards would constitute a double recovery and unjustly enrich the Neveroskis to the extent of $5,000. See Theobald v. Angelos, 44 N.J. 228, 239 (1965). It may be argued that the treble damages allowable under the Consumer Fraud Act are intended to be solely punitive in nature while the $5,000 award here was compensatory, and that for this reason there was no duplication of recovery in this case. We disagree and conclude that the treble damages provision of the act was intended both to compensate a victim for his loss and in addition provide a punitive recovery. In this case $5,000 of the $15,000 award represents compensatory damages and the remaining $10,000 represents the punitive aspect. To construe the statute otherwise would be contrary to the general policy of the law that there should be only one satisfaction of a wrong. We therefore place a ceiling of $15,000 (exclusive of attorneys' fees and costs) on the amount of recovery available to the Neveroskis under the judgments running in their favor. As for the fees and costs, we affirm the judgment below that $2,000 represents reasonable attorneys' fees and we add the sum of $1,000 for fees to the attorney for the Neveroskis for services on this appeal.

Claims for Indemnification
The trial judge denied the requests of W.T. Grant and Blue Ribbon for indemnification against each other on the judgments arising out of the Consumer Fraud Act. On appeal they contest these denials. In view of our holding as to nonliability of Blue Ribbon under the Consumer Fraud Act, there is no further purpose in discussing their respective claims for indemnity upon the finding of their joint liability below.

*383 W.T. Grant's liability to the Blairs under the New Jersey Consumer Fraud Act

The trial judge entered judgment in favor of the Blairs and against W.T. Grant for $3,270 which represented three times the $1,090 basic charge for the termite service contract that the Blairs purchased. W.T. Grant contends that it should not have been held liable on this court while the Blairs contend that they were not awarded sufficient damages.
The trial judge found that W.T. Grant committed several acts which amounted to unlawful practices under the Consumer Fraud Act. These included deceiving the Blairs into thinking they were getting a lifetime guarantee and promising them far more extensive services than were actually rendered. The judge also found that the price of the termite service contract was unconscionable compared to the services which were virtually worthless.
We find sufficient credible evidence in the record to support the trial judge's conclusions and agree with it that W.T. Grant's actions constituted deceptive and unconscionable practices under the Consumer Fraud Act.
The Blairs argue that the damages awarded them were insufficient because the loss they actually sustained included the finance charges they paid on the service contract. We agree that under the act the finance charges should be included in the Blairs' recovery. N.J.S.A. 56:8-19. Accordingly, the Blairs' damages should be computed at three times the contract's aggregate cost of $1,485.76, which is $4,457.28.
The trial judge also awarded the Blairs attorneys' fees in the amount of $1,500 and costs of suit. We find this award to be a reasonable one and further award the sum of $750 for fees on appeal.

W.T. Grant's liability to indemnify the Blairs
The trial judge entered judgment in favor of the Blairs against W.T. Grant based on its negligence for such sum *384 up to $5,000 which the Blairs will actually pay to the Neveroskis pursuant to the judgment of the Neveroskis against them. W.T. Grant challenges this determination.
The judge held in effect that W.T. Grant acted negligently in its performance of the termite service contract and that this resulted in the $5,000 of termite damage. There was evidence that when W.T. Grant treated the house in November 1971 its workmen did not drill through the concrete slab on which the house was set. Instead, they merely sprayed chemicals on the outside of the house. In March 1972 W.T. Grant again sprayed the house and also drilled a hole in the heater room and pumped chemicals into it. David Hamilton of Terminex, Inc. testified that W.T. Grant's method of treatment did not conform to what he considered professional standards. In response to a question from the judge he further testified that had W.T. Grant properly treated the premises, the damage which Hamilton observed in March 1973 would not have occurred. We conclude that there was sufficient credible evidence in the record to support the judge's finding that W.T. Grant was negligent in its treatment of the termite condition and that this resulted in the $5,000 of termite damage for which the Blairs were held liable. The judgment holding W.T. Grant liable to indemnify the Blairs to the extent that the Blairs pay the Neveroski judgment is therefore affirmed.

Contribution
The trial judge denied all claims for contribution. We find that he erred in this respect.
The judgment in favor of the Neveroskis against W.T. Grant was based upon the deceptive and fraudulent acts of W.T. Grant's employees, resulting in compensatory damages of $5,000. The judgment in favor of the Neveroskis against the Blairs and Blue Ribbon arose out of common law fraud producing the same damages.
*385 In view of the judge's factual findings which have been sustained by us, the Blairs and Blue Ribbon were joint tortfeasors with W.T. Grant in causing the same injury or damage. Although the liability of W.T. Grant arises by virtue of a statute and the liability of the Blairs and Blue Ribbon arises out of common law principles, nevertheless the nature of their wrongs is common in that all were found guilty of deception and fraudulent practices. In any event, the true test for contribution is joint liability, not joint, common or concurrent wrongs. See Farren v. N.J. Turnpike Auth., 31 N.J. Super. 356 (App. Div. 1954).
The Joint Tortfeasors Contribution Law, N.J.S.A. 2A:53A-1 to 5, directs contribution between tortfeasors where two or more persons are "jointly or severally liable in tort for the same injury to person or property." N.J.S.A. 2A:53A-1. The wrongs committed by all the defendants herein are appropriately "torts" regardless of the source of liability, and the fact that they have all been held liable for the same injury to wit, the termite damage to the property, brings them within the purview of the Joint Tortfeasors Contribution Law. Adler's Quality Bakery, Inc. v. Gaseteria, Inc., 32 N.J. 55 (1960).
A novel problem arises however as to the extent of contribution. As far as W.T. Grant is concerned the judgment against it consists of two parts: $5,000 for the compensatory damages and $10,000 for the penalty provided by the Consumer Fraud Act. It is our opinion that since the liability of Blue Ribbon and the Blairs is limited to compensatory damages for their common law wrong, only the compensatory portion of the W.T. Grant judgment should be considered in the computation of the contribution rights among the tortfeasors. It is only the $5,000 portion of the W.T. Grant judgment which is common with the judgment against the other defendants and which is subject to the provisions of the Joint Tortfeasors Act. Equitable considerations negate any participation of the Blairs and Blue Ribbon in the penalty portion of the W.T. Grant judgment.
*386 It should be noted, of course, that the right of contribution does not affect the judgments as entered, since it only comes into play when a tortfeasor pays more than his pro rata share of the joint and several judgments. Theobald v. Angelos, supra, 44 N.J. 228; Kolker Chemical Corp. v. Lumbermens Mut. Cas. Co., 81 N.J. Super. 556 (Ch. Div. 1963). As a consequence, we reverse the trial court on the issue of contribution and order that each of the three tortfeasors is entitled to a pro rata contribution from the others to the extent of moneys paid in excess of one-third of $5,000.

Other Miscellaneous Contentions
We have considered the contention of Blue Ribbon and W.T. Grant that a new trial should be granted because of partiality and prejudice on the part of the trial judge. This contention is wholly without merit. Equally frivolous is Blue Ribbon's application for a new trial on the basis of newly discovered evidence. Its motion did not meet the criteria for a new trial and was properly denied by the judge.

Conclusions
(1) Judgment in favor of the Neveroskis against W.T. Grant in the sum of $15,000 plus attorneys' fees of $2,000 and costs of suit is affirmed. Additional judgment is entered for counsel fees on this appeal in the sum of $1,000.
(2) Judgment in favor of the Neveroskis against Blue Ribbon Realty for $15,000 plus $2,000 counsel fees and costs of suit is reversed and set aside.
(3) Judgment in favor of the Neveroskis against Blue Ribbon and the Blairs in the sum of $5,000 is affirmed.
(4) The Neveroskis shall be limited to one satisfaction in the sum of $15,000 (exclusive of counsel fees and costs) from the money judgments set forth in (1) and (3).
(5) Judgment in favor of the Blairs against W.T. Grant in the sum of $3,270 plus attorneys' fees of $1,500 and *387 costs of suit is modified to the sum of $4,457.28 plus attorneys' fees of $1,500 and costs of suit. Additional judgment is entered for counsel fees on this appeal in the sum of $750.
(6) The Blairs' judgment against W.T. Grant for indemnity as to any sums actually paid by the Blairs to the Neveroskis pursuant to (3) is affirmed.
(7) Denial of contribution is reversed, and judgment of pro rata one-third contribution is entered as to the judgments of the Neveroskis against W.T. Grant, Blue Ribbon and the Blairs, with the caveat that W.T. Grant's right of contribution against Blue Ribbon and the Blairs shall be limited to a pro rata share of the $5,000 compensatory portion of the judgment referred to in (1).
(8) Motions were made during the pendency of the appeal with respect to the cost of preparing the transcript which were reserved. We direct that all parties share equally in the cost of preparation of the transcript.
(9) No costs are allowed on this appeal to any parties except as specifically designated in the foregoing paragraphs.
NOTES
[1] Blairs have not appealed from the $5,000 judgment against them.
[2] W.T. Grant also asserts that the award for compensatory damages of $5,000 is excessive.
[3] We note that on January 19, 1976, § 2 of the Consumer Fraud Act was further amended to provide that the use of any of the prohibited tactics "in connection with the sale or advertisement of any merchandise or real estate" shall constitute an unlawful practice bringing into play the statutory penalties. (Emphasis supplied). The Statement annexed to the bill reads:

This bill, which could be called the Truth in Real Estate Advertising Act, would correct the present omission of "real estate" from coverage under current statutes which provide effective procedures and penalties against misleading, deceptive or fraudulent advertising.
However, in a statement issued in conjunction with his signature on the bill, the Governor pointed out that the recent amendment was adopted not to change the law but only to clarify it by incorporating the term "real estate." He asserted that real estate was included in the legislation as it existed prior to this amendment.
We do not consider this statement or the sponsor's statement as significant or persuasive on the question of the interpretation of the act prior to said amendment. Nor do we express any opinion as to the construction of the act as amended.
[4] The Annual Messages of Governor Meyner of January 13, 1959 and January 12, 1960, which served as the administration's policy statement inspiring the adoption of the Act in 1960, also point in this direction.