251 N.J. Super. 271 (1990)
597 A.2d 1109
THE BOC GROUP, INC., PLAINTIFF,
v.
LUMMUS CREST, INC., A CORPORATION, ET AL., DEFENDANTS.
Superior Court of New Jersey, Law Division Bergen County.
Decided August 3, 1990.
*273 David R. Gross argued the cause for defendants (Budd, Larner, Gross, Rosenbaum, Greenberg & Sade, attorneys: David J. Novack, Leonard T. Nuara and Daniel Feuerstein, on the brief).
Richard E. Brennan argued the cause for plaintiff (Shanley & Fisher, P.C., attorneys; A. Dennis Terrell and Richard E. Brennan, on the brief)
MEEHAN, J.S.C.
This case is before the court on defendant, Lummus' motion to dismiss the 12th count of plaintiff's complaint alleging violations of the Consumer Fraud Act. N.J.S.A. 56:8-1, et seq.
This case arises from the design, engineering and operation of a plant in Texas intended to manufacture needle coke, which is used to produce graphite electrodes. Needle coke can be produced from various petroleum-derived feedstocks, including decant oil and pyrolysis tar.
Since the late 1960's, defendants, Lummus Co. (Lummus) and Maruzen Petrochemical Co. (Maruzen), had been conducting research and development efforts to produce high-quality needle coke from pyrolysis tars. Decant oil was the most often used feedstock at this point in time.
Plaintiff's subsidiary, Airco, after evaluating needle coke samples produced from pyrolysis tars by both Lummus and Maruzen, contacted defendant, Maruzen in 1976 in reference to Maruzen's research. In 1979, plaintiff began looking into the construction of its own needle coke production plant in conjunction with proposed plans to build another graphite electrode manufacturing plant. Plaintiff contacted Lummus and two other engineering companies to investigate the feasibility of constructing a plant which would produce needle coke from pyrolysis tar. Airco then authorized pilot plan tests, using defendants' technology, at each of three competing engineering companies and spent months performing tests to evaluate needle *274 coke samples supplied by the engineering companies to determine if it had the characteristics to produce graphite electrodes.
On May 28, 1980, plaintiff, after reviewing proposals from the three engineering companies, selected Lummus to design a commercial needle coke plant based on a modified "L Process". Between 1980 and 1981, Airco had Lummus perform numerous pilot plant tests using additional feedstocks to aid in the design of a commercial scale plant. Airco determined the suitability of each coke sample for the production of its graphite electrodes. In November, 1980, Airco contracted with the engineering company of Foster Wheeler to build a pilot plant in Niagara Falls, New York, to allow it to conduct tests using the modified "L Process".
Airco conducted studies of market demand and anticipated market share for its proposed coke needle plant which included investment and operation cost estimates from Foster Wheeler and Lummus and the retention of independent consultants. Airco also studied the use of decant oil rather than pyrolysis tar in the production of needle coke. In April, 1981, a Lummus feedstock screening study revealed that the plant production would be less than the designated needle coke production with Exxon pyrolysis tar, than if other pyrolysis tar and decant oil were used. Airco then authorized Lummus to redesign the plant using Airco, CCPC and Shell pyrolysis tars.
In June of 1981, Lummus gave Airco an initial product specification and performance guarantee based on the use of Exxon pyrolysis tar in the production of needle coke. In July of 1981, Airco requested that CCPC pyrolysis tar feedstock be used as the basis for guarantees, rather than the Exxon tar. Also during July, Airco's parent, the BOC Group (BOC), authorized $115 million for construction of the coke plant but required that the plant also be designed for the designated needle coke production rate when utilizing a decant oil stock. Due to this extra requirement BOC authorized an additional $5 million *275 for design, engineering and construction. Airco further directed Lummus to conduct pilot plant tests with two additional decant oils.
Between 1978 and 1982, Airco manufactured and tested electrodes made from needle coke derived from Shell pyrolysis tar. Airco advised Shell that it would make no further purchases of Shell's needle coke, due to the poor performance of the resulting electrodes. Also by 1982, Airco had conducted over 50 tests at its Niagara Falls pilot plant using over one dozen different pyrolysis tar and decant oil feedstock.
During Airco's fiscal year 1982, due to a severe drop in the demand for steel, Airco suffered a 22 percent decrease from the prior year in its graphite electrode shipments, which was in sharp contrast to its projections of a 23 percent increase in shipments. Airco also learned that the only commercially available pyrolysis tar derived needle coke, from Shell, was unsuitable for producing its graphite electrodes.
In March of 1983, after intense negotiations, Lummus and Airco agreed upon and signed the Engineering Services Agreement and Licensing Agreement. This agreement contained a clause which limited Lummus' total liability to $2 million for "all obligations, agreements, representations, warranties or guarantees." The agreement also provided that Lummus shall not be liable "for any special, incidental, indirect, or consequential damage of any nature", regardless of whether such claims were based on contract, tort or otherwise.
The Seadrift plant construction took over 18 months and cost approximately $125 million. The plant processed feedstock for the first time in September of 1983 but had to be shut down shortly thereafter due to mechanical problems. In March of 1984, the plant became fully operational and Airco, after firing its own plant manager, requested that Lummus conduct a comprehensive training program for its plant staff.
Subsequently, certain claims were made and agreements entered into which are not relevant to this decision. Additionally, *276 both parties agreed to embark on a Coke Quality Improvement Program (CQIP) using pyrolysis tar. The program's goal was to improve the quality of needle coke produced from pyrolysis tar to a level higher than that specified in the contractual guarantees. At this time, the plant was producing needle coke predominantly from decant oil. Both parties exchanged information, performed tests and prepared reports through October of 1985.
On June 19, 1985, Airco and Lummus management representatives met to discuss Lummus' rumored equity participation in a needle coke project undertaken by ANIC, an Italian petrochemical producer. Lummus told Airco that it was about to sign a contract with ANIC to build a needle coke plant in Italy that would use the M-L Process and not the L-Process used by Airco.
Airco was concerned that information it revealed during the CQIP would be utilized by Lummus in the design of the plant in Italy. Airco indicated that it was unhappy with the performance of the Seadrift plant and that its legal staff had recommended the commencement of a lawsuit against Lummus based on fraud. On July 11, 1985, Lummus assured Airco that it would take strict precautions to prevent Airco information and data from being utilized in the ANIC project.
On October 23, 1985, Lummus transmitted to Airco the final report on the experimental portion of the CQIP. On December 6, 1985, Airco notified Lummus that it was filing suit on several theories which later included violation of the Consumer Fraud Act.

Discussion
The New Jersey Consumer Fraud Act (the "Act"), N.J.S.A. 56:8-1, et seq., provides, in pertinent part:
The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission, of any material fact with intent that others rely upon such concealment, suppression or omission, in *277 connection with the sale or advertisement of any merchandise ... or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice;

N.J.S.A. 56:8-2.
The court agrees with plaintiff's contention that a corporation can be a "person" under the act in certain situations. In applying § 2 of the Act to a particular transaction, several words contained therein are expressly defined in § 1 and are not given their ordinary and special meaning. Morgan v. Air Brook Limousine, Inc., 211 N.J. Super. 84, 91, 510 A.2d 1197 (Law Div. 1986). "Person" is defined in N.J.S.A. 56:8-1(d) as including:
any natural person or his legal representative, partnership, corporation, company, trust, business entity or association, and any agent, employee, salesman, partner, officer, director, member, stockholder, associate, trustee or cestuis que trustent thereof. (emphasis added)
It is clear that a corporation may qualify as a person under the Act when it finds itself in a consumer oriented situation. See e.g. Dreier Co., Inc. v. Unitronix Corp., 218 N.J. Super. 260, 527 A.2d 875 (App.Div. 1986); Hundred East Credit Corp. v. Eric Schuster, 212 N.J. Super. 350, 515 A.2d 246 (App.Div. 1986); D'Ercole Sales, Inc. v. Fruehauf Corp., 206 N.J. Super. 11, 501 A.2d 990 (App.Div. 1985).
Plaintiff's main contention in opposition to the defendant, Lummus' motion to dismiss count 12 of the complaint, is that the Act's definition of merchandise is sufficiently broad to encompass a "licensing agreement" as a service. This court disagrees.
The Act, pursuant to N.J.S.A. 56:8-1(c), refers to "merchandise" as:
any object, wares, goods, commodities, services, or anything offered, directly or indirectly to the public for sale. (emphasis added)
The courts have recognized the "need to place reasonable limits upon the operation of the Act despite broad statutory language so that its enforcement properly reflects legislative intent ..." DiBernardo v. Mosely, 206 N.J. Super. 371, 375, 502 A.2d 1166 *278 (App.Div. 1986) citing Jones v. Sportelli, 166 N.J. Super. 383, 388, 399 A.2d 1047 (Law Div. 1979). In enacting the Act, the legislative concern was over sharp practices and dealings in the marketing and mass distribution of consumer goods and the adverse effect which these practices would have upon the disadvantaged and poorly educated people who are least able to cope with unethical solicitors. See Kugler v. Romain, 58 N.J. 522, 279 A.2d 640 (1971); cf. Daaleman v. Elizabethtown Gas Company, 77 N.J. 267, 390 A.2d 566 (1978).
The complex petroleum refining process at issue is not a service, nor is it merchandise under N.J.S.A. 56:8-1(c). What was sold to the plaintiff was an idea. Lummus did not sell a service but a design. All services rendered to plaintiff under the various agreements were collateral to the sale of its rare L-Process which made use of both pyrolysis tar and decant oil in the production of needle coke. The design was sold by the two defendants. Then plaintiff had to build the plant and produce the product.
Even if the court were to find that this new experimental process was a service sold to plaintiff, the process was certainly not the type of service contemplated by the Act, nor was it sold or capable of being sold "to the public". The entire thrust of the Act is "pointed to products and services sold to consumers in the popular sense". Neveroski v. Blair, 141 N.J. Super. 365, 378, 358 A.2d 473 (App.Div. 1976).
The suit before the court is between three multi-million dollar international corporations dealing with complex, state of the art technology in a very limited field. It involves the construction of a complex refinery and needle coke plant costing in excess of $125 million and agreements for $16 million in technology license fees and engineering service fees. The agreements represent the culmination of over 2 1/2 years of negotiations and testing. Plaintiff has failed to cite one case which would approach the complexity and magnitude of this case. For plaintiff to assert that this is the type of service contemplated *279 by the Act is wrong. The complex process and collateral services thereto bear no relation to computers, copying machines or franchises, which could be sold to the public at large even if only to a limited extent.
This court is aware of the Appellate Division case of Perth Amboy Iron Works v. Am. Home, 226 N.J. Super. 200, 543 A.2d 1020 (App.Div. 1988), recently affirmed by the Supreme Court at 118 N.J. 249, 571 A.2d 294 (1990). In Perth Amboy, the Act was found applicable to the purchase of a yacht by a corporation. Defendant, Johnson & Towers (J & T), allegedly had increased the engines' horsepower beyond factory ratings even though General Motors (GM) had advised its dealers that such increases were unauthorized. The engines, however, were advertised as GM approved. From the onset, the yacht experienced various problems with the performance of its engines including fires which caused over $200,000.00 of damages to the yacht which required replacement of the defective engines. Plaintiff claimed that it was misled by GM and J & T to believe that the engines were fully warranted by GM.
The Appellate Division reversed the trial judge's dismissal of the claim under the Act and in so doing stated that:
The trial judge apparently rejected the consumer fraud claim ... because the sale of the GM engines... to plaintiff was not a "mass distribution" problem addressed in DiBernardo. That determination is too restrictive a reading of DiBernardo which held that the Act was not extended to apply "to the isolated sale of a single family residence by its owner. This case, on the other hand, deals with a commercial seller and a mass produced engine, a large number of which plaintiff was prepared to show have also had engine failures.
226 N.J. Super. 200, 207 n. 5, 543 A.2d 1020 (emphasis added)
The Perth Amboy case is in accord with this court's decision in the case at bar. While yachts are not bought by average consumers, yachts are still available to the public at large and sold in large quantities. The Appellate Division also took notice of the fact that the engines were "mass produced". Perth Amboy at 208, 543 A.2d 1020. The highly sophisticated process sold by Lummus to BOC is neither available to the general public nor mass-produced by BOC. Though the yacht in question *280 cost over $200,000.00, the system in the present case was sold for over $16 million for a plant that was constructed at a price of over $125 million. This certainly is not a service sold to the public within the parameters of N.J.S.A. 56:8-1(c).
The Act was created to give new strength to protect the ordinary consumer in the purchase of merchandise in the public market place. Kugler, supra, 58 N.J. at 536, 279 A.2d 640. Under N.J.S.A. 56:8-4, the Attorney General is empowered to promulgate rules and regulations that are necessary to accomplish this objective. Pursuant to this authority, the Division of Consumer Affairs was established and administrative rules were adopted. N.J.A.C. 13:45A-1 et seq. In developing these rules, the Division of Consumer Affair identified 21 types of consumer transactions for goods and/or services ranging from defective automobile parts to the sale of meat and health club services. The "general [definition] can be construed under the doctrine of ejusdem generis as a comprehensive definition intended to incorporate other products or services similar in nature to those enumerated. See Neveroski, supra, 141 N.J. Super. at 379, 358 A.2d 473. The complex design in question bears no similarity whatsoever to any of these 21 comprehensive definitions.
The Act largely permits the meaning of "unlawful practice" to be determined on a case-by-case basis. Hundred East Credit Corp., supra, 212 N.J. Super. at 357, 515 A.2d 246 citing Kugler, supra, 58 N.J. at 543, 279 A.2d 640; D'Ercole, supra, 206 N.J. Super. at 29-31, 501 A.2d 990. Certain practices unlawful in the sale of personal goods to an individual consumer are not held unlawful in a transaction between particular business entities. Hundred East Credit Corp., supra, 212 N.J. Super. at 357, 515 A.2d 246. This is clearly not the type of situation contemplated by the Consumer Fraud Act. The three parties involved in this case are large corporations who negotiated for years before entering into a multi-million dollar contract for the sale of a design and for services collateral thereto. This is certainly not the case of a seller taking advantage of a naive purchaser. Though a corporation can be a naive consumer *281 in certain fields, see Hundred East Credit Corp., supra, the plaintiff in this case knew it was purchasing a new, state of the art idea which was still in an experimental phase. Plaintiff sought out defendant, Lummus, and others to submit proposed bids in relation to the construction of the Seadrift Plant which was to implement this new design. Plaintiff independently tested this design repeatedly before it entered into an agreement with defendant for its implementation.
For the foregoing reasons, this court finds that the design in question does not fall within the definition of "merchandise" within the parameters of the Consumer Fraud Act and that the plaintiff is not a "consumer" within the purpose and intent of the Act.
Plaintiff further contends that defendant's motion to dismiss the 12th count under the Act should be denied based upon the law of the case doctrine. Plaintiff claims that since the court granted plaintiff's motion to amend their complaint four years ago, that relitigation of this same point should be avoided. The court finds this argument to be completely without merit.
As stated in Daniel v. State, Dept. of Transp., 239 N.J. Super. 563, 581, 571 A.2d 1329 (App.Div. 1990);
The law of the case doctrine requires judges to respect unreversed decisions made during the trial by the same or higher court regarding questions of law. (citation omitted) The doctrine is grounded in the policy that once an issue is litigated and decided in a suit, relitigation of that question should be avoided, if possible.
The flaw in plaintiff's claim is that while the motion for leave to amend the complaint was vigorously disputed, the court did not make a decision on the merits of the claim; rather, the issue was the right to have the claim heard. The court did not make a ruling on the legal sufficiency of the claim, but only let plaintiff pursue this claim through discovery and to resolution on its merits. The mere approval to permit the filing of a *282 complaint does not sustain the complaint. The motion today is the first ruling on the merits of this claim.
For the foregoing reasons, defendant, Lummus' motion to dismiss count 12 of plaintiff's complaint alleging violations under the Consumer Fraud Act is granted. Defendant is to submit the appropriate order.