288 N.J. Super. 372 (1996)
672 A.2d 725
HAMPTON HOSPITAL, PLAINTIFF-RESPONDENT,
v.
JOSEPH BRESAN AND LYNN BRESAN, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Submitted February 22, 1996.
Decided March 13, 1996.
*373 Before Judges KING, KLEINER and HUMPHREYS.
Harold S. Vogel, attorney for appellants.
Giordano, Halleran & Ciesla, P.C., attorneys for respondent (David P. Corrigan, of counsel; Mr. Corrigan and Charles A. Cerussi, on the brief).
The opinion of the court was delivered by KLEINER, J.A.D.
*374 Plaintiff Hampton Hospital sued defendants Joseph Bresan and Lynn Bresan in the Cape May County Special Civil Part to collect $1,504.68, the balance of a bill for hospital services rendered to their son, age seventeen. Defendants filed a counterclaim under the Consumer Fraud Act, N.J.S.A. 56:8-1 to -48. After defendants successfully removed the action to the Law Division, plaintiff filed a summary judgment motion contending, in part, that defendants were not entitled to relief under the Act. The motion judge concluded that N.J.S.A. 56:8-2 does not encompass services performed by a hospital and granted plaintiff's motion. The issue has not been previously addressed in any reported decision in this State. We conclude that the motion judge correctly granted summary judgment and we affirm.
Encompassed in defendants' appeal is their contention that prior to the summary judgment motion, the motion judge improperly dismissed a count of their counterclaim which sought an award of punitive damages. That issue is subsumed in the broader issue of a hospital's liability for consumer fraud. Our affirmance of the summary judgment obviates a determination on the narrower issue. On appeal, defendants also contend that the motion judge erred in failing to advise them to amend their pleadings to add a count for damages predicated upon the concept of duress. We will address that contention in part four of this opinion.

I
The underlying material facts of defendants' consumer fraud claim are undisputed and the parties stipulated to the motion judge that the motion was "ripe for summary judgment." Because there are certain interpretations of those facts which are contradictory, we shall view the facts most favorable to defendants, who opposed the motion, as is required on appeal in a review of a decision granting summary judgment. See Antheunisse *375 v. Tiffany & Co., Inc., 229 N.J. Super. 399, 402, 551 A.2d 1006 (App.Div. 1988), certif. denied, 115 N.J. 59, 556 A.2d 1206 (1989).
Lawrence Bresan, defendants' seventeen-year-old son, attempted suicide in May 1991 by ingesting a large quantity of over-the-counter sleeping pills. Defendant Lynn Bresan, Lawrence's mother, arrived home shortly thereafter and took Lawrence to the emergency room of a local hospital, where he received medical treatment and was released.
Lawrence met with a psychiatrist, who recommended that he seek treatment for his depression, anxiety, and drug and alcohol abuse. The psychiatrist recommended that Lawrence participate in a thirty-day rehabilitation program. Defendant Lynn Bresan telephoned plaintiff and scheduled a meeting with its staff.
On May 12, 1991, defendants took Lawrence to plaintiff's hospital. Lawrence and defendants completed a number of standard forms, including a Request for Voluntary Admission and the Voluntary Admission Notice. The Voluntary Admission Notice provides:
All persons admitted as voluntary patients or converted to voluntary status have the following rights with regard to requesting a discharge:
1. All voluntary patients have the right to request discharge from Hampton Hospital by giving 48 hours notice either orally or in writing. Oral notice must be directed to a member of the patient's treatment team or to nursing staff.
2. Upon receipt of the notice, Hampton staff have 48 hours to assess the patient's condition and make appropriate plans for discharge or continued treatment. If the patient's condition so warrants, Hampton staff may seek involuntary commitment.
Lawrence was subsequently admitted to plaintiff's hospital as a voluntary patient. His hospital stay was insured under his mother's health insurance policy, which provided for up to thirty days of treatment.
Lawrence's recovery was progressing nicely for the first three weeks. However, because Lawrence's eighteenth birthday was approaching and he wanted to be at home on his birthday, he decided to leave the hospital prior to the completion of his thirty-day treatment plan. On June 3, 1991, Lawrence signed a Patient *376 Request to Terminate Inpatient Treatment. Twenty-four hours later, Lawrence withdrew his request, agreeing to remain in treatment.
Defendants contend that Lawrence was coerced into staying at the hospital until his insurance coverage ran out in an effort by the hospital to increase its gross income receipts. Lawrence certified that the orderlies who had been assisting in his treatment began to behave differently after he requested a discharge. He claimed, "They told me I was no good, that I was wasting everyone's time, that I was resisting treatment. They preyed on my fears and vulnerability to get me to agree to stay until our insurance ran out." Lawrence also alleged that Carol Whiteside, a representative of the hospital, called his mother and told her that if he "left before the thirty days were up, the hospital wouldn't sign [him] out, and if they didn't sign [him] out then [their] insurance company might not pay the bill."
On the morning following his request for discharge, Lawrence was taken into a room with five or six staff members who asked why he wanted to leave early. One of the doctors, Dr. Andrews, told Lawrence that if he insisted on departing prior to the completion of his treatment, he would be committed. That after-noon, Lawrence's mother arrived to bring him home. She was informed that Lawrence had changed his mind but she was not permitted to see him. Defendants characterize this action of the hospital as consumer fraud.
In its answer to defendants' counterclaim, plaintiff denied that its agents threatened and coerced Lawrence to remain at the hospital against his will. Plaintiff also denied that it engaged in any unlawful practice under the Consumer Fraud Act. Instead, plaintiff asserts that its agents were "doing their job and attempting to help a young man overcome a serious drug problem" by finishing his therapy.[1]
*377 The judge found that "[d]efendants have offered no proof to establish a conspiracy to benefit the hospital or upon which [he] could reasonably make such an inference." The judge concluded, "The Hospital through Dr. Andrews and its employees did what is required." The judge also determined that defendants offered no qualified medical proof to contest Dr. Andrew's conclusion that Lawrence was not well enough to be discharged within forty-eight hours of his discharge request.
Lawrence remained at the hospital until June 11, 1991. Defendants imply that Lawrence was kept at the hospital until that time because that is the date on which his "insurance ran out." Plaintiff contends, however, that he was released on that date because it was the natural termination of his thirty-day rehabilitation program.
The total bill for Lawrence's treatment came to $32,125.10. Defendants claim that over $7,000 of that total is attributable to the last week of the treatment, after Lawrence withdrew his request for a discharge. Lynn Bresan's insurance carrier paid $29,550.42, leaving a balance of $2,574.68. By April 19, 1992, defendants had paid $1,070 of the balance but no further payments *378 were made, thus prompting plaintiff to sue defendants for the remaining balance.[2]

II
N.J.S.A. 56:8-2, part of the Consumer Fraud Act, reads:
The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice....
The Act "is aimed basically at unlawful sales and advertising practices designed to induce consumers to purchase merchandise or real estate." Daaleman v. Elizabethtown Gas Co., 77 N.J. 267, 270, 390 A.2d 566 (1978). Its essential purpose is the "protection of consumers by eliminating sharp practices and dealings in the marketing of merchandise and real estate." Channel Companies, Inc. v. Britton, 167 N.J. Super. 417, 418, 400 A.2d 1221 (App.Div. 1979). The Legislature defined "merchandise" as including not only goods, but services as well. N.J.S.A. 56:8-1. The Act authorizes a consumer who has been deceived by the proscribed conduct to sue or counterclaim and recover treble damages, together with attorney's fees and costs. N.J.S.A. 56:8-19.
The remedial goal of the Act is to protect consumers and the Act is liberally construed to serve that end. Martin v. American Appliance, 174 N.J. Super. 382, 384, 416 A.2d 933 (App.Div. 1980); State v. Hudson Furniture Co., 165 N.J. Super. 516, 520, 398 A.2d 900 (App.Div. 1979). Notwithstanding this *379 directive, the courts have identified certain professions to which the Act is not applicable.
In Neveroski v. Blair, 141 N.J. Super. 365, 358 A.2d 473 (App. Div. 1976), we considered whether real estate brokers fall within the scope of the Act. We characterized real estate brokers as "semi-professional," offering "something beyond the ordinary commercial seller of goods or services  an activity beyond the pale of the act under consideration." Id. at 379, 358 A.2d 473. We also listed other professions that fall within this exempt category: "lawyers, physicians, dentists, accountants [and] engineers...." Ibid.
We also stated:
Certainly no one would argue that a member of any of the learned professions is subject to the provisions of the Consumer Fraud Act despite the fact that he renders "services" to the public. And although the literal language may be construed to include professional services, it would be ludicrous to construe the legislation with that broad a sweep in view of the fact that the nature of the services does not fall into the category of consumerism.
[Ibid.]
Neveroski was subsequently rendered obsolete by a statutory amendment that included within the Act deceptive practices in the sale of real estate. L. 1975, c. 294, § 1, eff. Jan. 19, 1976.
Of the professionals mentioned in Neveroski, only attorneys have been specifically deemed to be outside the scope of the Act. In Vort v. Hollander, 257 N.J. Super. 56, 607 A.2d 1339 (App.Div. 1992), we held that "attorney's services do not fall within the intendment of the Consumer Fraud Act." Id. at 62, 607 A.2d 1339. Citing Neveroski and the amendments that made it obsolete, we inferred that the Legislature would have "stated with specificity that attorneys were covered" by the Act had that been its intent. Ibid. We placed special emphasis on the fact that attorneys are regulated by an independent body, the Supreme Court. Ibid. See N.J. Const. art. VI, § 2, ¶ 3 (granting to the Supreme Court jurisdiction over the discipline of persons admitted to the bar).
*380 Prior to Neveroski and Vort, we were of the opinion that the Act applied to all industries and professions, even those that were regulated. Daaleman, supra, 150 N.J. Super. at 82, 374 A.2d 1237. The defendant in Daaleman urged that the Consumer Fraud Act should not apply to public utilities because they were regulated by the Board of Public Utilities Commissioners (PUC). Ibid. We disagreed, stating, "We can perceive no discernible basis for construing the act as not having been intended to apply either to this or any other regulated industry, profession or other business." Ibid.
The Supreme Court reversed our judgment. Daaleman, supra, 77 N.J. at 270, 390 A.2d 566. The Court comprehensively reviewed the regulatory structure applied to public utility companies. Ibid. The Court concluded as a matter of law that the pricing practices complained of were not violations of the Consumer Fraud Act and noted that they were being investigated by the PUC. Id. at 272, 390 A.2d 566. The Court found that the PUC had ample authority to order corrective and remedial action. Ibid. The Court also expressed a reluctance to permit two separate state agencies  the PUC and the Division of Consumer Affairs  to exercise jurisdiction over the practices of public utility companies. Ibid.
By analogy to a public utility which is regulated by the Public Utility Commission, and attorneys whose professional conduct is regulated and supervised by the Supreme Court, hospitals in New Jersey are regulated. N.J.S.A. 26:2H-1 designates the State Department of Health as the sole agency in charge of supervising hospitals and related health care services and facilities. That statute was enacted as part of the Health Care Facilities Planning Act, codified at N.J.S.A. 26:2H-1 to -26. The Department of Health has promulgated extensive regulations concerning the quality of care provided by health care professions and facilities. See, e.g., N.J.A.C. 8:43G-27.1 to -27.5 (providing specific plans and procedures for quality assurance at hospitals); N.J.A.C. 8:43G-11.1 to -11.6 (requiring all hospitals to have a discharge planning *381 program that includes methods of quality assurance); N.J.A.C. 8:43H-18.2 (requiring a written policy and procedure for discharge of a patient from a rehabilitative facility); N.J.A.C. 8:43H-17.2 (enumerating the rights of patients in a rehabilitative facility). The Department of Health is authorized to take certain measures if it finds a violation of any of its hospital regulations. N.J.A.C. 8:43G-2.9 permits the Department to impose a fine, cease admissions to a facility, revoke or suspend a license, and impose "other lawful remedies."
Because the issue posed by this litigation is of first impression in New Jersey, we have looked to other jurisdictions for precedent. We find that there are several decisions in Illinois which are persuasive.
Illinois has enacted a consumer protection statute very similar to New Jersey's. Illinois' Consumer Fraud and Deceptive Practices Act (Consumer Fraud Act) provides in part:
Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with the intent that others rely upon the concealment, suppression or omission of such material fact ... are hereby declared unlawful whether any person has in fact been misled, deceived or damages thereby.
[Ill. Rev. Stat. ch. 121 1/2, para. 262 (1989).]
The Illinois Court of Appeals has announced the purpose of the statute to be to "protect consumers and borrowers and businessmen against fraud, and unfair and deceptive acts in the conduct of any trade or commerce." Feldstein v. Guinan, 148 Ill. App.3d 610, 101 Ill.Dec. 947, 950, 499 N.E.2d 535, 538 (1986). Illinois' Act, like New Jersey's, covers the sale of services. Ibid.
In Feldstein, the plaintiff, a physician, allegedly entered into an employment contract with a county hospital. Id. at 948, 499 N.E.2d at 536. The hospital then notified the plaintiff that it was filling the position with another person. Ibid. The plaintiff sued the hospital, alleging a violation of the Consumer Fraud Act. Ibid. The trial court dismissed the consumer fraud count of the plaintiff's complaint and the plaintiff appealed. Ibid.
*382 The appellate court affirmed, holding that the Consumer Fraud Act does not apply to the practice of medicine. Id. at 950, 499 N.E.2d at 538. The court relied primarily on a decision by the Illinois Supreme Court, Frahm v. Urkovich, 113 Ill. App.3d 580, 69 Ill.Dec. 572, 447 N.E.2d 1007 (1983), which held that "the practice of law is not the equivalent of other ordinary commercial or business activities." Ibid.
Drawing a parallel to the legal profession, the Feldstein court held that "although the practice of medicine may have a business aspect, the commercial phases of medicine which directly affect the public are not at issue here." Ibid. Furthermore,
The practice of medicine is not the equivalent of an ordinary commercial enterprise. The statutory language making the Act applicable to trade or commerce does not include the practice of medicine as presented under the facts of this case.
[Ibid.]
The court also considered that the alleged wrong was purely private and did not affect the general public in any way. Id. at 951, 499 N.E.2d at 539.
The Illinois Appellate Court revisited the issue in Evanston Hospital v. Crane, 254 Ill. App.3d 435, 193 Ill.Dec. 870, 627 N.E.2d 29 (1993). In Evanston, the plaintiff hospital commenced an action to collect on a medical bill for services it had rendered for the defendant. Id. at 871, 627 N.E.2d at 30. As in the instant matter, the defendant filed a counterclaim, alleging consumer fraud. Ibid. The defendant predicated his consumer fraud claim on numerous acts which he contended amounted to a failure to provide proper care. Id. at 872-73, 627 N.E.2d at 31-32. He claimed that the hospital issued a number of publications that misrepresented the standard of care provided at its facility. Id. at 876, 627 N.E.2d at 35. The trial court granted summary judgment on the defendant's counterclaim in favor of the plaintiff and the defendant appealed. Id. at 873, 874, 627 N.E.2d at 32, 33.
The Appellate Court again relied on the Frahm decision and its treatment of attorneys. Id. at 876, 627 N.E.2d at 35. The court observed that Frahm declined to find consumer fraud in what was essentially an allegation of professional malpractice. Ibid. The *383 court also noted that Frahm excluded the practice of law from the language "conduct of any trade or commerce." Ibid.
On the basis of the Frahm decision, the court held,
The reasoning of Frahm relating to the practice of law can be applied equally as well in this case to the practice of medicine. We see no distinction between the practice of law and the practice of medicine for the purpose of determining the applicability of the Consumer Fraud Act to a situation as in this case, where the only basis for liability against the hospital is the medical negligence of its doctors, nurses and/or ancillary staff personnel.
[Id. at 876-77, 627 N.E.2d at 35-36.]
The court concluded that the allegations supported not a consumer fraud claim, but a medical malpractice claim. Id. at 877, 627 N.E.2d at 36. The court found a distinction between professional malpractice and the type of commercial misdeeds guarded against by the Consumer Fraud Act. Ibid. It concluded, "Although the practice of medicine may have a business aspect, the commercial phases of medicine which directly affect the public are not at issue here." Ibid. As in Feldstein, the court was of the opinion that the claim was purely personal and did not affect the public.[3]Ibid.
We find the Illinois decisions persuasive. The Illinois Act is quite comparable to our Consumer Fraud Act. Hospitals in this jurisdiction are strongly regulated. As in Daaleman, we can find no purpose to a requirement that hospital services be within the purview of the Consumer Fraud Act when those same services fall within the purview of the Department of Health.

III
Defendants contend that they have a cause of action against plaintiff for duress. They justify their failure to plead duress in *384 their counterclaim by claiming that they thought that they would be entitled to recover under the Consumer Fraud Act. Defendants argue that the trial judge, aware that the Consumer Fraud Act would not apply, should have directed them to amend their counterclaim to include the duress count. Defendants maintain on appeal that they are entitled to amend their counterclaim. We need not dwell on defendants' contention. It is simply without merit. Although leave to amend a pleading is within the discretion of the trial court, there is absolutely no authority that obligates a trial court to direct a party to amend its pleadings to assert a new or additional claim. Defendants did not seek to amend their counterclaim previously. We will not entertain defendants' unwarranted invitation to direct the trial court to permit an amendment at this juncture.
The order granting summary judgment to plaintiff is affirmed.
NOTES
[1] Before the Law Division, plaintiff insisted that Lawrence Bresan was admitted to its facility for treatment for drug abuse. Predicated on that contention, plaintiff contended that even if a hospital can be found responsible under the Consumer Fraud Act, in this case it is immune from civil liability pursuant to N.J.S.A. 2A:62A-3, which provides:

Any fully licensed doctor of medicine ... or registered nurse, and any resident or intern on the staff of a hospital, whether or not fully licensed, who in good faith treats or renders care to a person in an attempt to cure such person's dependency upon controlled dangerous substances .. . shall not be liable for any civil damages as a result of any of his acts or omissions in rendering such care, provided the skill and care given is that ordinarily required and exercised by others in the profession. The grant of immunity provided for herein shall also extend to the administrative personnel including all members of the medical staff and board of directors of hospitals and clinics treating such persons.
Having reached the conclusion that plaintiff may not be held responsible under the Consumer Fraud Act, we need not determine whether plaintiff's immunity claim has merit.
[2] In their counterclaim, defendants maintain that they are entitled not only to their out-of-pocket expenses of $1,070, but also to all money paid to plaintiff on behalf of Lawrence. Defendants' pleadings in the Law Division fail to demonstrate a theory upon which defendants would be entitled to claim a return of any funds paid by the insurance carrier.
[3] We note that the Illinois court was not called upon to determine if the hospital advertising was in fact deceptive. Our decision today does not involve any advertisement or marketing device. Defendants do not claim that they selected plaintiff hospital on the basis of any false, misleading, or deceptive advertisement. Our decision today is limited to an exclusion of hospitals from the purview of the Consumer Fraud Act for services rendered to its patients, pursuant to medical judgment.