ELDER et al., Appellants,

v.

FISCHER et al., Appellees.

[Cite as *Elder v. Fischer* (1998), 129 Ohio App.3d 209.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–970738.

Decided July 24, 1998.

*Janet E. Pecquet* and *Thomas G. Bedall,* for appellants.

*Geoffrey E. Webster, J. Randall Richards* and *Edward J. Collins,* for appellees.

PAINTER, Judge.

We are first asked to determine whether the Ohio Consumer Sales Practices Act (the "CSPA") applies to the billing practices of a residential-care facility. We hold that it does. Second, we are asked to determine whether the trial court abused its discretion in denying leave to amend a complaint to assert claims of additional resident-rights violations, breach of contract, fraud, conversion, and breach of fiduciary duty. We hold that it did.

## I. Procedural Posture

In their first amended complaint, appellants John Elder, Sandra McCall, and Theodore Anderson named, as defendants, appellees Abe Fischer (in his capacity as administrator and owner of The Terrace at Westside), Justarr, Inc., Abe Fischer Productions, The Terrace at Westside, and J.E.F., Inc. (The record demonstrates that the appropriate name of Justarr, Inc., is Justarr, Inc., d.b.a. The Terrace at Westside.)[1] Elder, McCall, and Anderson are all residents of The Terrace at Westside, a residential-care facility. We will refer to appellants as the residents throughout this opinion.

Justarr, Inc. moved to dismiss under Civ.R. 12(B)(6), and J.E.F., Inc. and Abe Fischer moved for summary judgment. In its Civ.R. 12(B)(6) motion, Justarr, Inc. argued, in part, that the CSPA did not apply to residential-care facilities, that the residents had no private right of action under the Residential State Supplement program ("RSS"), and that the residents' claims under the CSPA were barred by the statute of limitations. The summary-judgment motion incorporated the arguments raised in the Civ.R. 12(B)(6) motion and claimed as well that J.E.F., Inc. and Abe Fischer were not proper party defendants.

The trial court dismissed the residents' claims under the CSPA, holding that claims against health-care providers are outside the scope of the CSPA because health-care providers are subject to specific legislation and are comprehensively regulated. The trial court granted summary judgment for J.E.F., Inc. on all claims, ruling, in part, that J.E.F., Inc. and Justarr were separate and not interrelated entities. It granted summary judgment in favor of Abe Fischer because there was no evidence that any of his individual acts violated the CSPA. The residents dismissed their claims against The Terrace at Westside and Abe Fischer Productions, Inc. At that point, all defendants were eliminated. The trial court also denied the residents' motion for leave to amend their complaint.

---

1. Although appellants captioned the complaint a class action, because of its decision to grant defendants' motions, the trial court never addressed the issue of certification.

The residents appeal the trial court's dismissal of their claims under the CSPA and the trial court's denial of their motion for leave to amend their complaint. They have not appealed the trial court's determination that J.E.F., Inc. and Abe Fischer were not properly named defendants. Therefore, although the residents' notice of appeal (and, for consistency's sake, the caption of this opinion) lists as appellees Abe Fischer, Justarr, Inc., The Terrace at Westside, J.E.F., Inc., and Abe Fischer, Productions, Inc., the actual appellee, in light of the court's rulings and the residents' dismissals, is Justarr, Inc., d.b.a. The Terrace at Westside, which we will refer to as Justarr.

## II. Standard of Review for a Motion to Dismiss

■ In order to dismiss a complaint for failure to state a claim upon which relief can be granted, under Civ.R. 12(B)(6), "it must appear beyond doubt from the complaint that the plaintiff can prove no set of facts entitling him to recovery."[2] " '[I]n construing a complaint upon a motion to dismiss for failure to state a claim, we must presume that all factual allegations of the complaint are true and make all reasonable inferences in favor of the nonmoving party.' "[3] Appellate review of a Civ.R. 12(B)(6) dismissal is *de novo*.[4] Therefore, we must, for purposes of this appeal, take all of the residents' allegations as true. The following statement of facts is garnered from the residents' complaint. Of course, we assume that when this case is tried, Justarr will have its own version of the facts.

## III. The Alleged Facts

The residents are eligible for RSS, are Medicaid recipients, are severely disabled, and are dependent upon Justarr for the provision of services normally provided by a facility participating in the RSS program. (The RSS program is a state program which adds to Supplemental Security Income payments and provides payment for accommodations, supervision, and personal-care services for the program's recipients.[5]) Under the RSS program, Justarr is paid $750 per month and may not charge or collect more than that amount for services it must provide as an approved living arrangement with RSS.

---

**2.** *O'Brien v. Univ. Community Tenants Union, Inc* (1975), 42 Ohio St.2d 242, 71 O.O.2d 223, 327 N.E.2d 753, syllabus.

**3.** *York v. Ohio State Hwy. Patrol* (1991), 60 Ohio St.3d 143, 144, 573 N.E.2d 1063, 1064–1065, quoting *Mitchell v. Lawson Milk Co.* (1988), 40 Ohio St.3d 190, 192, 532 N.E.2d 753, 756.

**4.** *Hunt v. Marksman Prod., Div. of S/R Industries, Inc.* (1995), 101 Ohio App.3d 760, 656 N.E.2d 726.

**5.** R.C. 173.35.

John Elder has been a resident receiving RSS since 1991, and Sandra McCall and Theodore Anderson have been residents since 1994. Justarr is the residents' representative payee through the Social Security Administration and receives the residents' monthly checks on their behalf to be used for their care. (The complaint alleges "defendants" are the payee, but based on the procedural posture of this case, in which all other defendants have been dismissed or otherwise eliminated, we will refer to Justarr as the payee.) From his monthly payment of Supplemental Security Income ("SSI") and Social Security benefits, Elder should be receiving a monthly total of $246 for his personal use. From their respective monthly payments of SSI, McCall and Anderson should be receiving $226 each.

The Hamilton County Department of Human Services advised Justarr in October 1994 that it must accept from the residents the RSS payment in full and could not supplement the amount from the $246 or $226. But each month since that date, Justarr has received the residents' checks as representative payee and has cashed them. Justarr has provided Elder $10 a month in cash and $30 a month in cigarettes. It has provided McCall and Anderson $30 a month. Justarr has kept the remainder to apply to charges for which it already has received payment under RSS or Medicaid.

On January 2, 1995, Justarr provided each resident a handwritten list of charges for services for which it wanted payment, without explanation and without telling the residents that the items and services were paid for by RSS and Medicaid. Justarr also presented the residents printed contracts, listing by reference the items for which they were to be charged. Each was told that, as a condition of his or her continued residence at The Terrace at Westside, he or she was required sign the contract. The contracts were then applied retroactively to the date on which each resident began living at The Terrace at Westside.

The handwritten list of supplies, services and monthly charges is as follows: $100 for nursing assistance; $20 for arranging for a psychiatrist to visit; $30 for toiletries, paper tissues, soap and toilet paper; $30 for clean linens; $20 for laundry; $30 for medical supplies; $50 for arranging to have a pharmacy monitor medication; $50 for arranging to have a pharmacy deliver prescriptions; $50 for arranging a doctor's visit; and $100 for assistance with daily living activities. Justarr charged Elder the specified amounts for all the listed services and supplies. It charged McCall for all the specified supplies and services except arranging for a psychiatrist's visit, medical supplies, and assistance with daily living activities. Justarr charged Anderson for all the supplies and services except medical supplies and assistance for daily living activities.

The residents allege that Justarr has engaged in unfair or deceptive acts by charging them for items Justarr must provide under the RSS program, by

intentionally, knowingly, and negligently overcharging for services for which the residents received no benefit, by charging for items provided under RSS or Medicaid or provided free by third parties (such as "arranging" for a pharmacy to deliver prescriptions), by coercing the residents to sign the contracts and then applying the contracts to services provided prior to the date signed, by "overloading" the agreements with spurious and false charges knowing that the residents could not pay, and by refusing to return to them the monies the residents were entitled to monthly. The residents further claim that Justarr engaged in unconscionable acts because it took advantage of the residents' status, knowing the residents could not pay for the charges when the contracts were signed, but coercing them to sign the contracts.

## IV. Legislative Intent of the CSPA

There is no dispute that the residents are "consumers" and Justarr is a "supplier" as defined by the CSPA. At issue is whether the arrangement between the residents and Justarr may be considered a consumer transaction under the CSPA.

### A. *Expressio Unius Est Exclusio Alterius*

■ The purpose of the CSPA is to protect consumers from "unscrupulous suppliers" in a manner not afforded under the common law.[6] "A consumer (particularly a nonbusiness one) may be relatively naive and unskilled in the area involved, whereas the supplier will generally be more knowledgeable about the field, practice, or product. As marketing and consumer services become more complex, the legislature felt that consumers must be afforded redress that permits them to escape from the results of a deceptive seller. Therefore, a consumer transaction should be defined with the policy of protecting the unwary consumer in mind."[7]

■ In determining whether the allegations raised by the residents fall under the CSPA, we must first ascertain the legislative intent of the statute. To do so, we look initially to the language of the statute.[8] In using the statute's language to determine the legislature's intent, we may neither delete words used nor insert words not used.[9]

---

6. *State ex rel. Celebrezze v. Howard* (1991), 77 Ohio App.3d 387, 393, 602 N.E.2d 665, 669.

7. *Id.* at 393–394, 602 N.E.2d at 669–670.

8. *Glouster Community Bank v. Winchell* (1995), 103 Ohio App.3d 256, 264, 659 N.E.2d 330, 335.

9. *Id.*

The statute defines a "consumer" as a person "who engages in a consumer transaction with a supplier,"[10] and a "supplier" is defined as a person "engaged in the business of effecting or soliciting consumer transactions."[11] The statute defines a "consumer transaction," in pertinent part, as a sale of an item of goods or a service to an individual for primarily personal purposes.[12] The statute specifically excludes from the definition of "consumer transaction" transactions between (1) public utilities and their customers, (2) financial institutions, dealers in intangibles, and insurance companies and their customers, (3) certified public accountants or public accountants and their clients, (4) attorneys, physicians, or dentists and their clients or patients, and (5) veterinarians and their patients pertaining to medical treatment.[13]

We note that the legislature specifically excluded certain health-related transactions from the "consumer transactions" afforded protection under the CSPA. It did not, however, specifically exclude health-care, nursing-home, or residential-care facilities. Applying the maxim of *expressio unius est exclusio alterius* (specific inclusion of one thing implies the exclusion of another), we conclude that had the legislature wanted to exclude from the purview of the CSPA residential-care facilities or any other businesses or professions, it only needed to have said so.[14] "Inasmuch as the legislature chose not to include such an exception it must be presumed that none was intended. Under such circumstances this court is not disposed to supply an exception where none exists by statute."[15]

For example, one Ohio court, implicitly relying on the above maxim, has held that a demand-for-payment notice sent by a hospital was unconscionable under the CSPA because it simulated an official document. The court acknowledged that physicians were specifically excluded, but that because hospitals were not, hospitals had to abide by the CSPA.[16] We believe that that construction applies to the facts at hand.

---

**10.** R.C. 1345.01(D).

**11.** R.C. 1345.01(C).

**12.** R.C. 1345.01(A).

**13.** *Id.*

**14.** See *Silver Circle v. Thomas* (Nov. 29, 1995), Hamilton App. No. C–950416, unreported, 1995 WL 699892.

**15.** *Patton v. Diemer* (1988), 35 Ohio St.3d 68, 70, 518 N.E.2d 941, 943. See *Malone v. Academy of Court Reporting* (1990), 64 Ohio App.3d 588, 582 N.E.2d 54.

**16.** *Thorton v. Meredia Suburban Hosp.* (Nov. 21, 1991), Cuyahoga App. No. 59405, unreported, 1991 WL 244206.

## B.  Application of FTC Determinations

Furthermore, the CSPA contains language which directs that "due consideration and great weight" be given to "federal trade commission orders, trade regulation rules, and guides, and the federal courts' interpretation of subsection 45(a)(1) of the Federal Trade Commission Act." [17]  The Federal Trade Commission has "unequivocally stated that state-regulated professions are not exempt from coverage of the FTC Act." [18]  In fact, federal courts have concluded that the FTC Act and other antitrust regulations are applicable to the commercial aspects of such professions.[19]  While the CSPA has excluded consumer transactions between physicians and patients, we do not believe, in light of the legislature's direction to consider decisions applying the FTC Act, that the legislature intended that the billing practices of a residential-care facility would be excluded from the CSPA solely on the basis that it is a regulated business.

## V.  Common Law Does Not Support the Exclusion of Residential–Care Facilities From the CSPA

Justarr argues that because Ohio courts have made common-law exclusions from what constitutes a "consumer transaction," the listed exclusions are not exclusive.  Particularly, Justarr, citing *Heritage Hills, Ltd. v. Deacon*,[20] seems to argue that the "common law" exclusion of residential lease transactions from the CSPA opened the door for the exclusion of regulated industries and all their practices.  In *Heritage Hills, Ltd. v. Deacon*, the Ohio Supreme Court supported its decision to exclude residential lease transactions from the CSPA on the ground that the legislature's intent to exclude such transactions was clear.  The legislature had rejected a bill specifically including the lease of real property within the definition of "consumer transaction."  The court further supported its decision by acknowledging that the Landlord–Tenant Act contains its own unconscionable-practice provision in R.C. 5321.14(A).

What Justarr claims to be "common law" exclusions are not additional exclusions, but merely the courts' recognition of what is or is not encompassed by the plain language of the CSPA.  Real estate is not a "consumer transaction" because it does not fall within the definition of a good, service, franchise, or intangible as

---

17.  R.C. 1345.02(C).

18.  *Gadson v. Newman* (C.D.Ill.1992), 807 F.Supp. 1412, 1419.

19.  *Id.*

20.  *Heritage Hills, Ltd. v. Deacon* (1990), 49 Ohio St.3d 80, 551 N.E.2d 125.

provided by the statute.[21]   A residential lease is a conveyance of an interest in real estate and, therefore, not a service.[22]   The sale of goods by auction is a consumer transaction as applied to an auctioneer and the purchaser of an item; however, the relationship between an auctioneer and the owner of the item to be auctioned does not constitute a consumer transaction.[23]   A chiropractor is a physician under the CSPA and explicitly is excluded.[24]   Obviously, courts have refused to apply the statute narrowly and have given deference to the intent of the legislature.

We do not interpret the holdings of any of the cases cited by Justarr to mandate exclusion of regulated businesses or professions not specifically excluded.   If anything, the courts' decisions strengthen our conclusion that we must not supply an exception for residential-care facilities under the CSPA, where the language of the statute demonstrates the legislature chose not to do so.

VI.   Regulated Industries Are Not Automatically Excluded from the CSPA

■   The trial court determined that because residential-care facilities were regulated by the Ohio Department of Health, and residents were thus provided specific administrative remedies, the CSPA did not apply to residential-care facilities.   As we stated above, we believe that the legislature did not intend to exclude transactions between residential-care facilities and their residents from consumer transactions under the CSPA because it did not specifically do so. Further, even were we to determine that the legislature's intent was not clear from the language of the CSPA, we are not willing to hold that the regulation of an industry automatically removes it from the statute's application.   This is "because occupations with high potentials for consumer fraud are commonly licensed, including debt collectors, vocational schools, funeral directors, automobile and mobile home sellers, *nursing home owners*, employment agencies, television repairmen, auto repairmen, plumbers, electricians, appliance repairmen, and optometrists."[25]   (Emphasis added.)   If industry regulations were to inform our determination of whether the transactions between residential-care facilities and their residents should be excluded from the protection offered under the CSPA, we would not look at whether the industry was regulated, but whether

---

21.   *Heritage Hills, Ltd. v. Deacon, supra; Rose v. Zaring Homes, Inc.* (1997), 122 Ohio App.3d 739, 702 N.E.2d 952, fn. 5.

22.   *Heritage Hills, Ltd. v. Deacon, supra.*

23.   *State ex rel. Celebrezze v. Elliott:  One Stop Repair Shop* (Mar. 13, 1990), Tuscarawas C.P. No. 89CV100–355, unreported.

24.   *Chiropractic Clinic of Solon v. Kutsko* (1994), 92 Ohio App.3d 608, 636 N.E.2d 422.

25.   Roberts & Martz, Consumerism Comes of. Age:  Treble Damages and Attorney Fees in Consumer Transactions:  The Ohio Consumer Sales Practices Act (1981), 42 Ohio St.L.J. 927, 959.

the industry regulations explicitly defined unfair, deceptive, or unconscionable acts and whether an individual consumer remedy applied for those acts.[26]

To that extent, we find persuasive the analysis applied to the exemption of regulated businesses and professions by the New Jersey Supreme Court in *Lemelledo v. Beneficial Mgt. Corp. of Am.*[27] The New Jersey Supreme Court determined that, based on the legislative intent as expressed by the language of the New Jersey Consumer Fraud Act ("CFA"), the CFA should be applied broadly to accomplish its remedial purpose and that it should ordinarily be assumed that the CFA applies to an otherwise-covered consumer practice. The court was persuaded by the language of the CFA, which stated it was a cumulative remedy and allowed for private suits as well as attorney-general actions. It determined that those aspects of the statute reflected a legislative intent to "enlarge fraud-fighting authority and to delegate that authority among various governmental and nongovernmental entities, each exercising different forms of remedial power." [28]

The court explained:

"That legislative intent is readily inferable from the ongoing need for consumer protection and the salutory [*sic*] benefits to be achieved by expanding enforcement authority and enhancing remedial redress. When remedial power is concentrated in one agency, underenforcement may result because of lack of resources, concentration on other agency responsibilities, lack of expertise, agency capture by regulated parties, or a particular ideological bent by agency decisionmakers. See, e.g., *Arcadia v. Ohio Power Co.*, 498 U.S. 73, 87–88, 111 S.Ct. 415, 423–24, 112 L.Ed.2d 374, 388–89 (1990) (Stevens, J., concurring) * * * . Underenforcement by an administrative agency may be even more likely where, as in this case, the regulated party is a relatively powerful business entity while the class protected by the regulation tends to consist of low-income persons with scant resources, lack of knowledge about their rights, inexperience in the regulated area, and insufficient understanding of the prohibited practice. The primary risk of underenforcement—the victimization of a protected class—can be greatly reduced by allocating enforcement responsibilities among various agencies and among members of the consuming public in the forms of judicial and administrative proceedings and private causes of action.

---

26. See Horvath & Nemore, Nursing Home Abuses as Unfair Trade Practices (1986), 20 Clearinghouse Review 801.

27. *Lemelledo v. Beneficial Mgt. Corp. of Am.* (1997), 150 N.J. 255, 696 A.2d 546.

28. *Id.* at 269, 696 A.2d at 553.

"The Legislature, of course, need not diffuse enforcement power to combat fraud, and it certainly may concentrate that authority in one or more agencies or in private citizens. That judgment, however, is for the Legislature, not for this Court. We are loathe to undermine the CFA's enforcement structure, which specifically contemplates cumulative remedies and private attorneys general, by carving out exemptions for each allegedly fraudulent practice that may concomitantly be regulated by another source of law. The presumption that the CFA applies to covered practices, even in the face of other existing sources of regulation, preserves the Legislature's determination to effect a broad delegation of enforcement authority to combat consumer fraud." [29]

The court then determined that in order to overcome the presumption that the CFA applies to a covered activity, a court must be convinced that "a direct and unavoidable conflict exists between the application of the CFA and application of the other regulatory scheme or schemes. It must be convinced that the other source or sources of regulation deal specifically, concretely, and pervasively with the particular activity, implying a legislative intent not to subject parties to multiple regulations that, as applied, will work at cross-purposes." [30] (This same sort of thinking is evidenced in *Heritage Hills, Ltd., supra,* where the court recognized that the Landlord–Tenant Act was "complete within itself." *Id.,* 49 Ohio St.3d at 83, 551 N.E.2d at 128.)

The New Jersey Supreme Court continued:

"In the modern administrative state, regulation is frequently complementary, overlapping, and comprehensive. Absent a nearly irreconcilable conflict, to allow one remedial statute to preempt another or to co-opt a broad field of regulatory concern, simply because the statutes regulate the same activity, would defeat the purposes giving rise to the need for regulation. It is not readily to be inferred that the Legislature, by enacting multiple remedial statutes designed to augment protection, actually intended that parties be subject to only one source of regulation." [31]

Ohio's CSPA, like New Jersey's consumer-protection statute, is a remedial statute and, thus, should be broadly construed to effectuate its purpose of protecting consumers. Likewise, the remedies provided by the CSPA are in addition to or cumulative of remedies for the same conduct under state or local

29. *Id.* at 269–270, 696 A.2d at 553–554.

30. *Id.* at 270, 696 A.2d at 554.

31. *Id.* at 271, 696 A.2d at 554. Accord *Celebrezze v. Hughes* (1985), 18 Ohio St.3d 71, 18 OBR 102, 479 N.E.2d 886.

law.[32] The CSPA also allows for private suits in addition to actions brought by the Ohio Attorney General. Further, the CSPA specifically excludes certain regulated businesses or professions.

R.C. Chapter 3721 and Ohio Adm.Code Chapter 3701 regulate residential-care facilities. Specifically, R.C. 3721.13 lists thirty nonexclusive rights of residents. These residents' rights were conceived not to give residents special rights, but to restore basic human rights that had been eroded.[33] Included in the residents' rights are the right to be fully informed in writing, prior to or at the time of admission and during the resident's stay, of the basic rates the residential facility charges, the right to receive a monthly bill of itemized charges not included in the basic rates, the right to be free from financial exploitation, and the right of a resident to manage his or her personal financial affairs.[34] Ohio Adm.Code 3701–17–57 provides that, prior to beginning any residency, the facility and the prospective resident shall enter into an agreement which includes an explanation of all charges, a statement that all charges, fines, and penalties are included in the agreement, and a statement that the basic rate shall not change without thirty days' notice. Ohio Adm.Code 3701–17–61 provides that "[a] residential care facility shall not coerce, induce, or prompt a resident to assign, give, or sign over to the facility money * * * or anything of value other than payment for services rendered by the facility." [35]

R.C. 3721.17 provides an aggrieved resident three distinct remedies: a grievance procedure, an administrative procedure, or a civil suit. If a resident prevails in a civil suit for the violation of statutory rights, he or she may be awarded actual and punitive damages and reasonable attorney fees limited to the work reasonably performed.[36] The right to a private cause of action was included because the drafters of the legislation were not confident that the Department of Health would adequately implement the statute.[37] Neither R.C. 3721.13 nor other sections of R.C. Chapter 3721 regulate the use of unfair, deceptive, or unconscionable contractual provisions by residential-care facilities. The regulations and statute require a resident to be informed of the basic rate charged, the

---

**32.** R.C. 1345.13.

**33.** Note, H.B. 600: Ohio's Bill of Rights for Nursing Home Patients (1980), 5 U.Dayton L.Rev. 507, 510–511.

**34.** R.C. 3721.13(A)(25) through (27).

**35.** See R.C. 3721.15.

**36.** R.C. 3721.17(I).

**37.** See Note, H.B. 600: Ohio's Bill of Rights for Nursing Home Patients, *supra*, at 523, fn. 108.

services available, any additional charges not covered under the Social Security Act, and the right to receive a monthly bill itemizing charges not included in the basic rate. Neither the statute nor the Administrative Code provisions cover fraudulent or deceptive billing practices. In other words, the statute and its regulations do not wholly encompass the acts alleged in the complaint in this case. Further, the statute, unlike the CSPA, does not specifically provide for a private cause of action for declaratory judgment, an injunction, or a class action.

Likewise, our review of the RSS statute and its regulations and Cincinnati Municipal Code Chapter 847 provides us with no reason to presume that the CSPA is not applicable to the facts of this case. Thus, even were we to ignore the plain language of the CSPA, we would conclude that transactions between residential-care facilities and their residents are not excluded from its purview.

## VII. The Trial Court Erred in Its Application of the Law of Other States

The trial court relied on judicial interpretations of the consumer-protection statutes enacted in New Jersey, Illinois, and Pennsylvania in reaching its conclusion that the CSPA does not apply to residential-care facilities. Its reliance, however, was misplaced. Particularly, those cases all question whether actions alleging medical treatment and malpractice, as opposed to business practices, fall within the purview of the various consumer-protection statutes. In *Hampton Hosp. v. Bresan*,[38] the defendant filed a counterclaim in response to a collection action filed by the plaintiff, alleging that the plaintiff coerced her son to remain in the hospital in an effort for the hospital to increase its revenue. The court concluded that a claim for consumer fraud did not apply to hospital services regulated by the Department of Health. The court specifically limited its decision to "an exclusion of hospitals from the purview of the Consumer Fraud Act for services rendered to its patients, *pursuant to medical judgment.*"[39] (Emphasis added.) This limitation was reiterated by the court in *Lemelledo v. Beneficial Management Corp. of America.*[40] The court stated that its holding was so limited and that it had found persuasive Illinois cases which "found a distinction between professional malpractice and the type of commercial misdeeds guarded against by the Consumer Fraud Act."[41]

---

**38.** *Hampton Hosp. v. Bresan* (1996), 288 N.J.Super. 372, 672 A.2d 725.

**39.** *Id.* at 383, 672 A.2d at 731, fn. 3.

**40.** *Lemelledo v. Beneficial Mgt. Corp. of Am.* (1996), 289 N.J.Super. 489, 674 A.2d 582, affirmed (1997), 150 N.J. 255, 696 A.2d 546.

**41.** *Id.* at 498, 674 A.2d at 586.

The trial court cited the Illinois cases referred to by the New Jersey court. In *Evanston Hosp. v. Crane*,[42] the defendant predicated his consumer-fraud counterclaim, filed after a hospital commenced a collection action, on acts by the hospital which amounted to a failure to provide proper care. The court refused to apply the Illinois Consumer Fraud Act because the only basis for liability against the hospital was the medical negligence of its doctors, nurses, or ancillary staff. Such allegations, the court determined, supported a medical malpractice claim.

In *Feldstein v. Guinan*,[43] the trial court concluded that when a hospital, after allegedly entering an employment contract with a physician, informed the physician that it was filling the position with someone else, there was no violation of the Illinois Consumer Fraud Act. The court reasoned that although the practice of medicine may have a business aspect, the commercial phases which directly affect the public were not at issue in that case.

Subsequently, in *Gadson v. Newman, supra,* the court pointed out that amendments to the Illinois law no longer required proof of a public injury. It further examined whether the legislature's use of "trade or commerce" in defining the application of the law would exclude the business aspects of a profession. It concluded that while professions were afforded immunity from the act because they were subject to other regulations, at issue before it was a business contract between a hospital and a medical clinic, and, in such circumstance, there was no reason why "contracts for medical service should be distinguished from ordinary commercial contracts regulated by the Illinois Consumer Fraud Act."[44] Further, in *Sullivan's Wholesale Drug Co., Inc. v. Faryl's Pharmacy, Inc.*,[45] the appellate court found that Illinois's Consumer Fraud Act applied to a nursing home's agreement with its former pharmacy provider that permitted the nursing home to keep fifteen percent of the residents' payments to providers without informing the residents.

The Pennsylvania case cited by the trial court determined that services performed by physicians were excluded from the Pennsylvania Consumer Act where the action was premised on statements concerning a patient's course of treatment and the probable results of that treatment.[46] The court concluded that

---

42. *Evanston Hosp. v. Crane* (1993), 254 Ill.App.3d 435, 193 Ill.Dec. 870, 627 N.E.2d 29.

43. *Feldstein v. Guinan* (1986), 148 Ill.App.3d 610, 101 Ill.Dec. 947, 499 N.E.2d 535.

44. *Gadson*, 807 F.Supp. at 1418.

45. *Sullivan's Wholesale Drug Co., Inc. v. Faryl's Pharmacy, Inc.* (1991), 214 Ill.App.3d 1073, 158 Ill.Dec. 185, 573 N.E.2d 1370.

46. *Foflygen v. Zemel* (1992), 420 Pa.Super. 18, 615 A.2d 1345.

to impose liability under the Consumer Act would make a physician the guarantor of treatment and results.

While the above decisions held that governmental regulation of professional conduct precludes a medical malpractice claim wrapped in the guise of consumer fraud from being asserted under a consumer-protection statute, none of the cases went so far as to exclude commercial business practices. At issue in this case are the billing practices of a residential-care facility. There are no allegations concerning medical treatment or the rendering of any "professional" service. Therefore, we sustain the residents' first assignment of error.

## VIII. Motion for Leave to Amend

██ The trial court refused to allow the residents the opportunity to amend their complaint a second time. The residents requested leave to add additional plaintiffs and to bring a claim under R.C. 3721.17(I), as well as claims of fraud, conversion, breach of residents' rights in general, breach of contract, and breach of fiduciary duty.

██ Civ.R. 15(A) provides that the court must freely give leave to amend a complaint when "justice so requires." This is because the spirit of the Civil Rules contemplates the resolution of cases on their merits and not on pleading deficiencies. The denial of leave to amend a complaint rests in the discretion of the trial court. Where, however, "it is possible that the plaintiff by an amended complaint, may set forth a claim upon which relief can be granted, and it is tendered timely and in good faith and no reason is apparent or disclosed for denying leave, the denial of leave to file such an amended complaint is an abuse of discretion." [47] The trial court denied the residents' motion for leave to amend their complaint because it found that the only reason they attempted to amend their complaint was to defeat the motions before the court and because the claims were available at the onset of litigation.

Although the court provided a reason for its denial of leave, we believe that, under the facts of this case, where leave was requested early in the case, prior to discovery, where Justarr would not be unduly prejudiced by the addition of the claims, and where there is no "aura of bad faith," the trial court abused its discretion by not granting leave.[48] Accordingly, we sustain the residents' second assignment of error.

---

47. *Peterson v. Teodosio* (1973), 34 Ohio St.2d 161, 175, 63 O.O.2d 262, 269–270, 297 N.E.2d 113, 122.

48. See *Hoover v. Sumlin* (1984), 12 Ohio St.3d 1, 12 OBR 1, 465 N.E.2d 377, paragraph two of the syllabus.

We reverse the judgment of the trial court and remand this case for further proceedings consistent with law and this opinion.

*Judgment reversed*
*and cause remanded.*

SUNDERMANN, P.J., and MARIANNA BROWN BETTMAN, J., concur.