Paul, Moya, and Yolanda Andolsek appeal from a common pleas court judgment entered pursuant to a jury verdict in favor of Augustin Jokic in connection with claims for trespass, invasion of privacy, infliction of emotional distress, and tortious interference with business arising from a series of eleven thousand harassing telephone calls made to their home and business over a four-year period and from twenty-one incidents where baby-food jars filled with paint had been thrown at the Andolsek's restaurant, the Villa Rosa Pizzeria, located on East 185th Street in Cleveland, and from an incident where nails had been thrown into the restaurant parking lot.
On appeal, the Andolseks contend that the judgment is against the manifest weight of the evidence and that the court erred in dismissing their claims for negligent infliction of emotional distress, and in refusing to admit into evidence a telephone journal kept by the late Mary Andolsek which allegedly detailed the incidents of harassment and paint throwing. After careful review, we reject these contentions and affirm the judgment of the trial court.
The history of the case reveals that in 1981, the Andolseks bought a home on the north side of Chardon Road in Willoughby Hills, Ohio. In 1989, Jokic built a home across the street from the Andolseks and re-graded his property which the Andolseks claim increased water run-off onto their property. Although Jokic disputed this claim, he incurred expenses to correct the problem which led to the deterioration of the relationship with the Andolseks.
In 1995, the Andolseks began to receive anonymous phone calls at their home and at the pizzeria. They changed their home telephone number to an unlisted number, but that only increased the number of calls received at the Villa Rosa. They attributed these calls to Jokic. Beginning in January 1997, amid the receipt of the harassing phone calls, the Villa Rosa experienced a series of what eventually amounted to twenty-one incidents where baby-food jars filled with paint had been thrown at Villa Rosa and one occasion where nails and screws were thrown into the parking lot.
The record reveals that on January 16, 1998, the Andolseks filed a complaint against Jokic alleging trespass, invasion of privacy, infliction of emotional distress, and tortious interference with business. Following discovery, the case proceeded to trial.
At trial, the Andolseks' case generally focused on the following incidents: telephone calls received at Villa Rosa on October 10, 1998, from a British Petroleum gas station in Bainbridge, Ohio at 4:00 p.m., and from a British Petroleum gas station in Madison, Ohio at 8:40 p.m. It also concerned incidents of paint and nails being thrown at the Villa Rosa.
The Andolseks presented their case regarding the phone calls made from the British Petroleum gas station in Bainbridge, Ohio through the testimony of Nick Vittek, a cashier at the Bainbridge gas station, who testified that he had received a phone call from Yolanda at 4:00 p.m. on October 10, 1998 inquiring if anyone was using the gas station's pay phone. At that time, he testified that he saw someone using the phone, and that he obtained the license plate number of the vehicle parked there.
Police Officer Robert Weir testified that in response to a complaint filed by Yolanda alleging that Jokic had made fourteen harassing phone calls from that gas station, he investigated asking Jokic to come to the police station. Jokic denied being in Bainbridge on that day. However, when Vittek gave the plate number to the police, they matched it to a plate registered to a vehicle owned by Jokic.
In her direct examination, Yolanda Andolsek testified about the history of the Andolseks' relationship with Jokic and used a journal compiled by her late mother, Mary, to refresh her recollection about the phone calls and the paint and nail throwing incidents.
Specifically, Yolanda testified that on October 10, 1998, the Villa Rosa received a series of anonymous hang-up phone calls beginning at 8:40 p.m. She testified that caller identification indicated that the calls as coming from a pay phone at Baker's British Petroleum gas station in Madison, Ohio. Yolanda called the gas station and spoke with Christina Loomer, the attendant, and asked her to write down the license plate number of the vehicle at the pay phone and to call the police. In addition, Yolanda testified that although she personally had never seen Jokic throw paint at the Villa Rosa, she did see him throw nails and screws in the parking lot on March 30, 1997.
The Andolseks also called Loomer who testified that she had received a phone call from Yolanda and at her request obtained the license plate number of the person on the phone. In addition, Loomer called the police as Yolanda had requested. Further, Loomer testified that she had seen Jokic using the pay phone on October 10, 1998.
Officer Michael Torok testified that on October 10, 1998, he investigated the Baker British Petroleum calls in Madison and arrived at the gas station at 8:59 p.m., finding Jokic there using the pay phone. He determined that twenty-six phone calls had been made from that pay phone to the Villa Rosa Pizza beginning at 8:41 p.m. and ending at 8:59 p.m. He spoke with Jokic who denied placing any phone calls to Villa Rosa, explaining to Officer Torok that he had tried to call his wife, but that her line was busy. Torok also testified that central dispatch called his home phone and received a busy signal.
Next, Dr. James Eisenberg, a psychologist, testified that he interviewed Paul, Yolanda, and Moya Andolsek after the filing of this lawsuit when the phone calls and paint throwing incidents had ceased. Even though he did not diagnose any psychological disorder related to the telephone harassment, he stated that the Andolseks exhibited symptoms consistent with harassment which included nightmares, headaches, sleeplessness, fear, and panic.
Dr. Michael Stoller, an economist, then testified about lost revenue and decreased business at the Villa Rosa which he attributed to the telephone harassment. Dr. Stoller stated that Villa Rosa had to purchase security and surveillance equipment and to increase its hours of operation and prices in order to recoup lost revenue.
After Andolsek rested, Jokic proceeded with his case-in-chief offering testimony to rebut the Bainbridge and Madison telephone incidents. Jokic called Dennis Kelly, a superintendent at Airport Greens, a golf course in Willoughby Hills, who stated that on October 10, 1998, he saw Jokic installing a chain-link fence at 2:00 p.m. According to Kelly, Jokic had not yet completed the fence, but by 7:00 a.m. the next morning, the fence had been completely installed. Next, Jokic called Vinco Zalac, a business acquaintance, who testified that he stopped by Jokic's residence at 3:30 p.m. on October 10, 1998, noticed Jokic's green Jeep in the garage, and spoke with Jokic's wife, Tonka, who told him that Jokic had not yet returned home from work. Then, Jokic called another business acquaintance, Vladimir Mulsin, who testified that he arrived at Jokic's home at 6:00 p.m. on October 10th, and Jokic drove them to Geneva, Ohio to view a parcel of real estate, stopping at the British Petroleum gas station in Madison to purchase gas. Finally, Jokic testified and denied that he made anonymous phone calls to the Villa Rosa on October 10, 1998 from either gas station and denied throwing paint or nails on the Villa Rosa property. Jokic then rested.
Following the charge of the court and deliberation, the jury returned a verdict in favor of Jokic. The Andolseks now appeal from this judgment and raise three assignments of error for our review. The first assignment of error states:
I. THE JURY VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
The Andolseks urge that they offered competent credible evidence to support a jury finding of trespass, intentional infliction of emotional distress, invasion of privacy, and interference with business operations against Jokic. Jokic maintains that the Andolseks failed to prove any of their claims, and the jury verdict is not against the manifest weight of the evidence. Thus, the issue here concerns whether the judgment in favor of Jokic is against the manifest weight of the evidence.
In Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77, the court stated that the court of appeals [should] be guided by a presumption that the findings of the trier-of-fact were indeed correct. In C.E. Morris Co. v. Foley Constr. Co. (1978), 54 Ohio St.2d 279, the court stated in its syllabus:
 Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence.
The first cause of action relating to trespass concerns the allegations that Jokic threw paint and nails at the Villa Rosa.
The Restatement 2nd of Torts provides:
 158. Liability for Intentional Intrusions on Land One is subject to liability to another for trespass, irrespective of whether he thereby causes harm to any legally protected interest of the other, if he intentionally
 (a) enters land in the possession of the other, or causes a thing * * * to do so, * * *.
The Comment section to this Restatement states:
 * * * The actor, without himself entering the land, may invade another's interest in its exclusive possession by throwing, propelling, or placing a thing either on or beneath the surface of the land or in the air space above it. * * *.
Further, the Illustrations provide the following:
 3. A intentionally throws a pail of water against a wall of B's house. A is a trespasser.
Regarding these incidents, the testimony is disputed. Yolanda testified that she saw Jokic throw nails in the parking lot on March 30, 1997. However, on cross-examination, she conceded that she had never actually seen Jokic throw paint at the Villa Rosa. During his testimony, Jokic denied throwing anything at the Villa Rosa.
Regarding the second cause of action, intentional infliction of emotional distress, the court set forth the elements of intentional infliction of emotional distress in Retterer v. Whirlpool Corp. (1996),111 Ohio App.3d 847:
 1) that the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff; 2) that the actor's conduct was so extreme and outrageous as to go `beyond all possible bounds of decency' and was such that it can be considered as `utterly intolerable in a civilized community,' * * *; 3) that the actor's actions were the proximate cause of plaintiff's psychic injury; and 4) that the mental anguish suffered by plaintiff is serious and of a nature that `no reasonable * * * [person] could be expected to endure it.'"
Here the evidence is incomplete. The Andolseks presented evidence of afternoon calls received at the Villa Rosa from a gas station in Bainbridge, Ohio, and Yolanda Andolsek testified about twenty-six anonymous phone calls received at the Villa Rosa between 8:40 p.m. and 8:59 p.m. on October 10, 1998, from the British Petroleum gas station in Madison, Ohio as confirmed by Officer Torok. She also referenced during her testimony that the Villa Rosa had received eleven thousand such calls, and she testified about twenty-two paint throwing incidents over a four-year period, all of which she admitted ceased during 1998, the year the complaint was filed in this case.
Dr. James Eisenberg testified that Paul, Yolanda, and Moya Andolsek suffered the symptoms of harassment including nightmares, headaches, sleeplessness, fear, and panic. However, a careful reading of his testimony reveals that while these are typical symptoms of those who suffer from harassment, he did not diagnose them with any psychological disorder related to the harassment.
Jokic, on the other hand, denied any involvement in the phone calls or the incidents of paint throwing. Kelly and Zalac testified that they saw him at different times during the afternoon on October 10thwhen the phone calls were made from the gas station in Bainbridge, Ohio to Villa Rosa. Jokic admitted that he used the pay phone at the gas station in Madison, Ohio to call his wife, but claimed that her line was busy, which Officer Torok confirmed.
Regarding the third cause of action, invasion of privacy, the court in Haller v. Phillips (1990), 69 Ohio App.3d 574, stated:
 An actionable invasion of the right of privacy is * * * the wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering shame or humiliation to a person or ordinary sensibilities.
In this regard, Yolanda testified that Villa Rosa had received more than eleven thousand anonymous phone calls in a four-year period and presented evidence of Jokic's alleged involvement on October 10, 1998; in addition, she referred to the incidents of paint and nails. Jokic denied involvement and presented witnesses to corroborate his whereabouts on October 10, 1998.
Finally, regarding the Andolseks' claim for interference with business, the court in Brahim v. Ohio College of Podiatric Medicine (1994), 99 Ohio App.3d 479, 489, stated:
 A "business interference" action is based on the principle that "one who, without a privilege to do so, induces or otherwise purposely causes a third party not to enter into, or continue, a business relationship with another, or perform a contract with another, is liable to the other for the harm caused thereby.
In this regard, the Andolseks relied on the phone calls and incidents and the testimony of Dr. Stoller who testified that he calculated the Villa Rosa suffered economic loss in excess of one hundred thirty-eight thousand dollars during the four-year period.
Upon review, we have concluded that while the Andolseks may have presented inferences of Jokic's involvement in these episodes, their case is but one of circumstantial evidence. Apparently, however, in light of his denials, the jury rejected the inferences of his culpability. The evidence here does not support an intentional infliction of emotional distress claim because Eisenberg does not even confirm the Andolseks suffered from serious emotional distress or serious mental anguish. Finally, the evidence does not of itself support a claim for business interference and, the evidence does not suggest the Andolseks carried their burden of proof on these matters. Some competent credible evidence exists to support the jury decision and, therefore, in accord with C.E. Morris, we will not disturb the jury verdict on appeal. Accordingly, this assignment of error is not well taken.
 II. THE TRIAL COURT ERRED BY DISMISSING ALL OF PLAINTIFF-APPELLANTS' CLAIMS FOR NEGLIGENCE.
In their complaint, the Andolseks alleged that Jokic's conduct amounted to negligent, intentional and reckless behavior as to all of their claims; they contend here that the court erred by dismissing their claim for negligent infliction of emotional distress. In its entry, the court stated:
 Plaintiffs' negligence claim is dismissed since the allegations in plaintiffs' complaint, even if taken as true, do not state a claim for negligent infliction of emotional distress.
Jokic maintains the complaint did not allege negligence as a cause of action. The issue here for our review concerns whether the court properly dismissed the action for negligent infliction of emotional distress in connection with the anonymous phone calls and the paint throwing incidents.
In Elder v. Fischer (1998), 129 Ohio App.3d 209, the court stated:
 In order to dismiss * * * for failure to state a claim upon which relief can be granted, under Civ.R. 12(B)(6), "it must appear beyond doubt from the complaint that the plaintiff can prove no set of facts entitling him to recovery." `[I]n construing * * * a motion to dismiss for failure to state a claim, we must presume that all factual allegations of the complaint are true and make all reasonable inferences in favor of the nonmoving party.' Appellate review of a Civ.R. 12(B)(6) dismissal is de novo.
In Paugh v. Hanks (1983), 6 Ohio St.3d 72, the court stated in its syllabus:
 A cause of action for the negligent infliction of serious emotional distress may be stated where the plaintiff-bystander reasonably appreciated the peril which took place, whether or not the victim suffered actual physical harm, and, that as a result of this cognizance or fear of peril, the plaintiff suffered serious emotional distress.
Further in Haller, supra, the court stated:
 When the alleged claim involves allegedly tortious conduct of an intentional nature, negligent infliction of emotional distress does not apply. The principles applicable to intentional infliction of emotional distress are applicable. (Emphasis added.)
In this case, the conduct of which the Andolseks complain is intentional in nature, and not negligent. In accordance with Haller, then the claims involving conduct of an intentional nature in making phone calls and throwing paint and negligent infliction of emotional distress do not apply. Therefore, we have concluded that the court did not err when it dismissed the claims relating to negligence. Accordingly, this assignment of error is overruled.
 III. THE TRIAL COURT ERRED IN REFUSING TO ADMIT THE HARASSMENT LOG WAS ERROR [SIC].
The Andolseks claim that the journal compiled by Mary Andolsek prior to her death, detailing eleven thousand harassing telephone calls and twenty-two incidents of paint and nails constituted a comprehensive record of harassment that the court should have admitted it as a business record or under the best evidence rule. Jokic counters that the log is inadmissible hearsay because Yolanda Andolsek is not competent to testify about the entries in the telephone journal compiled by her mother, and that the best evidence rule is not an exception to hearsay testimony. The issue here then concerns whether the court should have admitted the journal into evidence.
Initially, we recognize that in Cline v. American Aggregates Corp. (1989), 64 Ohio App.3d 503, 511-12, the court defined a business record as one where:
 * * * (i) the record was prepared by an employee of the business who had a duty to report the information; (ii) the person providing the information contained in the record had personal knowledge of the event or transaction reported; (iii) the record was prepared at or near the time of the event or transaction; and (iv) it was a regular practice or custom of the business in question to prepare and retain the type of record. * * *" In this case, Yolanda testified as to the entries but
admitted that she did not make them. She stated that her mother, Mary, made them and that many of them were not made contemporaneously with the incidents. In addition, there is no evidence to suggest that this journal constitutes a business record as defined in Cline, in that the evidence does not suggest that Mary had a duty to record this information, or that she prepared this record as a regular practice or custom in connection with the business of the Villa Rosa. Accordingly, we have concluded that the journal does not constitute a business record.
Further, the Andolseks suggest the journal is admissible under the best evidence rule. Evid.R. 1002 states:
 To prove the content of a writing, recording, or photograph, the original writing, recording, or photgraph is required, except as otherwise provided in these rules or by statute enacted by the General Assembly not in conflict with a rule of the Supreme Court of Ohio.
The Andolseks believe this journal kept by Mary is the best evidence to prove the occurrences. However, Yolanda could not authenticate these records at trial. The court permitted her to use the journal to refresh her recollection and to testify about what she recalled regarding these incidents. The best evidence of the existence of telephone calls would come from the telephone company records, not from an unauthenticated journal kept by a party. Accordingly, we have concluded the trial court did not abuse its discretion in refusing to admit the journal into evidence. Therefore, this assignment of error is overruled, and the judgment of the trial court is affirmed.
Judgment affirmed.
It is ordered that appellee recover of appellants his costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
PATRICIA A. BLACKMON, J., and JAMES M. PORTER, J., CONCUR